IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA        *
                                *    Case No. 8:21-cr-348
vs.                             *
                                *    April 7, 2023
JEREMY BROWN                    *
* * * * * * * * * * * * * * * *



<u>SENTENCING HEARING</u>

Heard in Courtroom 7A
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
April 7, 2023



<u>BEFORE THE HONORABLE SUSAN C. BUCKLEW</u>

<u>UNITED STATES DISTRICT JUDGE</u>




Official Court Reporter:        Tana J. Hess, CRR, FCRR, RMR
                                U.S. District Court Reporter
                                Middle District of Florida
                                Tampa Division
                                801 N. Florida Avenue
                                Tampa, FL  33602
                                813.301.5207
                                tana_hess@flmd.uscourts.gov


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:

FOR THE GOVERNMENT:

       Daniel J. Marcet
       U.S. Attorney's Office- FLM
       400 N. Tampa Street
       Suite 3200
       Tampa, FL  33602
       813.274.6028
       daniel.marcet@usdoj.gov

       Cherie L. Krigsman
       US Attorney's Office - FLM
       400 N. Tampa Street
       Suite 3200
       Tampa, FL  33602
       813.274.6000
       cherie.krigsman@usdoj.gov

       Risha Asokan
       DOJ - USAO
       400 N. Tampa Street
       Suite 3200
       Tampa, FL  33602
       813.274.6000
       risha.asokan2@usdoj.gov

FOR THE DEFENDANT:

       Roger Futerman
       Melissa A. Loesch
       Roger D. Futerman & Associates
       13620 49th Street N
       Suite 201
       Clearwater, FL  33762
       727.344.5511
       futermanlaw@yahoo.com

| | | |
|---|---|---|
| 9:01AM | 1 | (Call to order of the Court.) |
| 9:02AM | 2 | **THE COURT:** Good morning. |
| 9:02AM | 3 | **MR. FUTERMAN:** Good morning, Your Honor. |
| 9:02AM | 4 | **MR. MARCET:** Good morning. |
| 9:02AM | 5 | **THE COURT:** All right. The matter that is set this |
| 9:02AM | 6 | morning and set for sentencing is United States of America |
| 9:02AM | 7 | versus Jeremy Brown, and the case number is 21-348. |
| 9:02AM | 8 | Let me begin by asking counsel to state their |
| 9:02AM | 9 | appearances, and we'll start with counsel for the United |
| 9:02AM | 10 | States. |
| 9:02AM | 11 | **MR. MARCET:** Good morning, Your Honor. Daniel |
| 9:02AM | 12 | Marcet, Risha Asokan, and Cherie Krigsman on behalf of the |
| 9:02AM | 13 | United States, and with us at counsel table is Homeland |
| 9:02AM | 14 | Security Investigations Special Agent Timothy Campbell. |
| 9:02AM | 15 | **THE COURT:** And did you introduce Ms. Krigsman? |
| 9:02AM | 16 | **MR. MARCET:** I think I did. |
| 9:03AM | 17 | **THE COURT:** Okay. I missed that. All right. Thank |
| 9:03AM | 18 | you. And Mr. Futerman? |
| 9:03AM | 19 | **MR. FUTERMAN:** Good morning, Your Honor. Roger |
| 9:03AM | 20 | Futerman on behalf of Mr. Brown. Mr. Brown is seated to my |
| 9:03AM | 21 | left, and to my far is my senior associate Melissa Loesch. |
| 9:03AM | 22 | **THE COURT:** Good morning. |
| 9:03AM | 23 | **MS. LOESCH:** Good morning. |
| 9:03AM | 24 | **THE COURT:** Mr. Brown, I'm going to ask if you'll |
| 9:03AM | 25 | stand back up, please, sir, and I'm going to ask the courtroom |

9:03AM 1  deputy to swear you in.

9:03AM 2       **COURTROOM DEPUTY:**  Yes, Your Honor.  Please raise

9:03AM 3  your right hand.

9:03AM 4       (Defendant sworn.)

9:03AM 5       **COURTROOM DEPUTY:**  Please state your name for the

9:03AM 6  record.

9:03AM 7       **THE DEFENDANT:**  Jeremy Michael Brown.

9:03AM 8       **COURTROOM DEPUTY:**  Thank you.  You may put your hand

9:03AM 9  down, but please remain standing.

9:03AM 10       **THE COURT:**  Mr. Brown, I'm going to ask you a few

9:03AM 11  preliminary questions.  I do this in every single case before

9:03AM 12  we begin the sentencing.

9:03AM 13       In the past 24 hours, have you had any

9:03AM 14  medication of any kind?

9:03AM 15       **THE DEFENDANT:**  No, Your Honor.

9:03AM 16       **THE COURT:**  You're not taking any kind of medicine

9:03AM 17  for anything?

9:03AM 18       **THE DEFENDANT:**  No, Your Honor.

9:03AM 19       **THE COURT:**  All right.  The second question has to do

9:03AM 20  with the presentence investigation report that was prepared by

9:04AM 21  the probation office.  The probation officer who prepared the

9:04AM 22  report is seated over here in the jury box.  I have read

9:04AM 23  through that report.  Have you read through that report?

9:04AM 24       **THE DEFENDANT:**  Yes, I have, Your Honor.

9:04AM 25       **THE COURT:**  Have you been able to have sufficient

9:04AM 1    time to discuss it with your attorney?

9:04AM 2            **THE DEFENDANT:**  Yes, we discussed it, Your Honor.

9:04AM 3            **THE COURT:**  Do you need any more time to speak with

9:04AM 4    him before we start this morning?

9:04AM 5            **THE DEFENDANT:**  No, Your Honor.

9:04AM 6            **THE COURT:**  Okay.  And really that question was

9:04AM 7    directed to you.  Do you want any more time with Mr. Futerman

9:04AM 8    or Ms. Loesch before we start?

9:04AM 9            **THE DEFENDANT:**  I think we've said everything that

9:04AM 10   can be said, Your Honor.

9:04AM 11           **THE COURT:**  Okay.  All right.  Thank you, sir.  You

9:04AM 12   may have a seat.

9:04AM 13           Let me go through a couple of things before we

9:04AM 14   actually get started.  I want to make sure that I have all the

9:04AM 15   filings that were made in this case, so let me just go through

9:04AM 16   them briefly.  I have the United States' sentencing memorandum

9:05AM 17   and attachments that was filed on March the 24th.  I have the

9:05AM 18   Defendant's sentencing memorandum and attachments filed on

9:05AM 19   3/27.  I have the United States' response to Defendant's

9:05AM 20   sentencing memorandum and attachments filed on March 30th.  I

9:05AM 21   have numerous letters, some of which were sent directly to

9:05AM 22   chambers.  Others were forwarded by Ms. Aldridge.  I have read

9:05AM 23   all of them; had some duplicates, but I have read all of those

9:05AM 24   letters.

9:05AM 25           There was also a preliminary motion for

9:05AM 1  forfeiture seeking the forfeiture of a -- the shotgun, the

9:05AM 2  rifle, and the two grenades, and I entered a preliminary order

9:05AM 3  granting that forfeiture.

9:05AM 4  So with that said, let me ask the Government,

9:06AM 5  Mr. Marcet, has the Government filed anything that I haven't

9:06AM 6  gone through?

9:06AM 7  **MR. MARCET:** No, Your Honor.

9:06AM 8  **THE COURT:** Okay. Mr. Futerman, has the defense?

9:06AM 9  **MR. FUTERMAN:** No, Your Honor.

9:06AM 10  **THE COURT:** Okay. Then everything -- I have read

9:06AM 11  everything that has been filed. I've read the sentencing

9:06AM 12  memorandums, the attachments. I've read all of the letters

9:06AM 13  that were sent. And incidentally, if they were sent to

9:06AM 14  chambers, I made sure you all were copied with those letters.

9:06AM 15  So even though the letters were sent to me, I sent a copy to

9:06AM 16  counsel.

9:06AM 17  All right. Let me just talk a minute about the

9:06AM 18  presentence investigation report. Sorry, there's a lot of

9:06AM 19  paperwork up here. Mr. Brown, on -- in December, specifically

9:07AM 20  on December the 12th, 2022, a jury found you guilty of

9:07AM 21  knowingly possessing an unregistered shotgun having a barrel

9:07AM 22  less than 18 inches; found you guilty to possession of an

9:07AM 23  unregistered rifle having a barrel of less than 16 inches;

9:07AM 24  guilty of Count 3 of an explosive grenade; guilty of a second

9:07AM 25  explosive grenade; knowingly storing explosive materials, the

grenades, in violation of Attorney General regulations; and then they also found you guilty in Count 10 of willful retention of a document relating to the national defense, what we had called throughout the trip report, dated September 1st, 2011.

The probation officer has prepared a presentence investigation report that includes a number of things. It includes an advisory guideline calculation, and she has gone through the offenses and has calculated the advisory guidelines to a total offense level of 29. The criminal history category is I. Mr. Brown has no criminal history. And under those guidelines, the range of imprisonment is 87 to 108 months.

I should say that one of the offenses that Mr. Brown was convicted of, the storage offense, which I believe was Count 5, is a misdemeanor. The others are felony offenses.

She has also in the presentence report given me what she believed was a summary of the facts of this case, and obviously I'm familiar with the facts of this case, having tried the case back in December, but that's always part of the presentence investigation report. And she's also interviewed Mr. Brown and talked with him to get some personal data, and that is contained in the presentence investigation report as well. Education, employment, any history of substance abuse should there have been any, financial conditions, ability to

9:09AM 1    pay, and at some point I want to ask a question about that.

9:09AM 2    But at any rate, that's what's contained in the presentence

9:09AM 3    investigation report.

9:09AM 4              According to the addendum the probation officer

9:09AM 5    has filed, the Government has no unresolved objections; is that

9:10AM 6    correct?

9:10AM 7          **MR. MARCET:**  That's correct, Your Honor.

9:10AM 8          **THE COURT:**  Okay.  And, Mr. Futerman, the Defendant

9:10AM 9    does have two, and I'm going to read them as the probation

9:10AM 10   officer has styled them.

9:10AM 11             One is to the objection -- one is to the

9:10AM 12   increase in the advisory guidelines for obstruction of justice

9:10AM 13   under 3C1.1 and has summarized the objection as follows:  The

9:10AM 14   Defendant submits through defense counsel that the two-level

9:10AM 15   enhancement for obstruction of justice is not applicable, and

9:10AM 16   that -- that objection, as I understand it, still remains, but

9:10AM 17   I'll ask that question.

9:10AM 18             And the other is a -- an objection to

9:10AM 19   paragraph 75 in the presentence report.  This is the paragraph

9:10AM 20   that has to do with the Oath Keepers, and it also has a

9:11AM 21   footnote, and the objection is that this information is not

9:11AM 22   relevant.

9:11AM 23             Those are the two objections to the guidelines

9:11AM 24   in the presentence report.

9:11AM 25         **MR. FUTERMAN:**  So, Your Honor, on document 341 -- and

1  can I approach the Court with a copy?  It might be easier to

2  visually see it than pull it up to compare.

3          **THE COURT:**  All right.

4          **MR. FUTERMAN:**  I made the Government aware and I made

5  Ms. Campbell from probation aware, and I've just old-fashioned

6  highlighted the slight additions that don't actually affect the

7  guidelines, but Mr. Brown wanted me to point this out for the

8  Court and ask the Court to strike this.

9          **THE COURT:**  Okay.

10          **MR. FUTERMAN:**  So document --

11          **THE COURT:**  And I should have said, I only read the

12  final presentence investigation report, the one that is dated

13  or revised on 3/30/2023.

14          **MR. FUTERMAN:**  Yes.  Thank you, Your Honor.  So

15  document 341 had a provisional or initial request to object to

16  anything in that report.  The deadline was 3/16, and I filed a

17  response on 3/16 with numerous fairly minute objections in some

18  respects, which I'm presuming based on Court's recitation that

19  the PSI is now amended, such as five children, not four,

20  various other things.  But what is more consequential to

21  Mr. Brown is on the 3/16 deadline, compared to the 3/30

22  document that was filed, there are two additional categories,

23  and actually three paragraphs and one financial difference that

24  was -- I never had a chance to respond to because I never saw

25  this until 3/30.  So it's only when I started looking through

9:12AM  1  every paragraph, I saw that probation added these details that

9:12AM  2  were not in the initial report.

9:13AM  3  So we'd ask the Court to strike these

9:13AM  4  paragraphs.  It does not affect the sentencing guidelines, but

9:13AM  5  we think it should be struck because it was not included in the

9:13AM  6  original report, and Mr. Brown has an objection to that.

9:13AM  7  So I can start firstly with paragraph -- really

9:13AM  8  it's number 2 is a little easier.  But if we compare document

9:13AM  9  341 and 346, the Court saw in 346, there is an asset line, and

9:13AM  10  it relates to online fundraising platform GiveSendGo, which now

9:13AM  11  has Mr. Brown as an additional $169,925 in assets.  That was

9:13AM  12  not included under the asset line in the original report of 3/3

9:13AM  13  and the deadline by 3/16.  So document 341, I've tabbed it for

9:13AM  14  the Court, you can see that was not on there.  So we would have

9:13AM  15  objected to that because we think it's a trust, not in his

9:13AM  16  control, so it's not an asset.  So we would ask that to be

9:14AM  17  struck.

9:14AM  18  THE COURT:  Okay.  And I had -- was going to have a

9:14AM  19  question about that as well.  But go ahead with the others.

9:14AM  20  MR. FUTERMAN:  And then -- Your Honor, thank you.

9:14AM  21  The other additional paragraphs that were not in the report

9:14AM  22  that I had an opportunity to object to is under mental and

9:14AM  23  emotional health, paragraph 78 and 79 on page 14 in the

9:14AM  24  original document, document 341, that I've tabbed for the Court

9:14AM  25  number 1 and highlighted, and then the 3/30 document includes

9:14AM 1    paragraph 82, 83, and 84 that discusses some Baker Act

9:14AM 2    information that Mr. Brown disputes as to a correct factual

9:14AM 3    recitation of those events.  So -- it doesn't affect the

9:14AM 4    guidelines.  I don't think we need to spend a lot of time

9:14AM 5    arguing about the facts of that.  I haven't been given today

9:14AM 6    any supporting documents or since this amendment.  I just ask

9:14AM 7    that it be struck.  They were not included in the original one,

9:15AM 8    and I wasn't given notice that, "Hey, we're now adding these."

9:15AM 9    I had to go through each paragraph and catch that.

9:15AM 10           And so I would ask that the additional basically

9:15AM 11   opinions and discussions in paragraph 82 and 83 and 84 just be

9:15AM 12   struck from the --

9:15AM 13           THE COURT:  Okay.  I will note that, but you got it

9:15AM 14   at the same time I got it.  So if you had a concern, you should

9:15AM 15   have made it an objection.

9:15AM 16           MR. FUTERMAN:  I understand, but I was looking

9:15AM 17   through each paragraph.  I didn't anticipate there would be

9:15AM 18   these additional paragraphs just added.  So I'm looking through

9:15AM 19   guidelines, I'm looking through the material stuff, and then

9:15AM 20   when I sent to Mr. Brown, we discussed it.  He pointed that out

9:15AM 21   to me as we went through it, and I said, "I will object to the

9:15AM 22   Court."  We're talking a few days ago.

9:15AM 23           So I thought this was the proper platform to

9:15AM 24   object because I'm not -- it doesn't seem that often that

9:15AM 25   probation adds these paragraphs, such as an asset line which is

9:15AM 1 not something you're necessarily looking for when you're going

9:15AM 2 through the material PSI. So maybe -- I apologize, and I

9:16AM 3 should have written an objection a couple of days ago, three

9:16AM 4 days ago. I understand. I just wanted you to be aware of it.

9:16AM 5 Mr. Brown brought it out, and I would ask the Court to strike

9:16AM 6 it as it wasn't added on the original document that I filed on

9:16AM 7 the deadline, which was 3/16, with all the objections that had

9:16AM 8 been made.

9:16AM 9 　　　　THE COURT: So that would be the Baker Act

9:16AM 10 information that says he was Baker Acted on two separate

9:16AM 11 occasions?

9:16AM 12 　　　　MR. FUTERMAN: Correct, 82, 83, and 84. Those are

9:16AM 13 opinion statements.

9:16AM 14 　　　　THE COURT: He -- I'm sorry. Is he claiming he

9:16AM 15 wasn't Baker Acted on both of those occasions or one occasion?

9:16AM 16 　　　　MR. FUTERMAN: It wasn't a Baker Act adjudication.

9:16AM 17 It wasn't as clear-cut as that. He was taken into custody.

9:16AM 18 He's claiming that the -- paragraph 82 is a completely false

9:16AM 19 statement as it relates to testimony from his ex-wife. There's

9:16AM 20 not -- you know, that's a fairly acrimonious relationship. So

9:16AM 21 he claims that on 82, that there was -- that was not accurate,

9:16AM 22 and that on 83, there was no -- there was -- and 84, there was

9:17AM 23 no ever Baker Act finding or any finding that there were any

9:17AM 24 Baker Act issues. And he was immediately released in a few

9:17AM 25 hours on one of those occasions and shortly thereafter on

| | | |
|---|---|---|
| 9:17AM | 1 | another occasion.  And what he doesn't want, being sentenced to |
| 9:17AM | 2 | the Bureau of Prisons, for this to be in his file because it |
| 9:17AM | 3 | could affect various things, and I understand that position. |
| 9:17AM | 4 | THE COURT:  Well, yeah.  And I was going to recommend |
| 9:17AM | 5 | mental health counseling just because he's been Baker Acted on |
| 9:17AM | 6 | two occasions, which -- or Baker Acted because you're a danger |
| 9:17AM | 7 | to yourself or others.  So let me inquire of the probation |
| 9:17AM | 8 | officer.  If you would stand? |
| 9:17AM | 9 | THE PROBATION OFFICER:  Yes, Your Honor. |
| 9:17AM | 10 | THE COURT:  And would you state your name? |
| 9:17AM | 11 | THE PROBATION OFFICER:  Tyler Campbell, Your Honor. |
| 9:17AM | 12 | THE COURT:  Okay.  Ms. Campbell -- and as I said |
| 9:17AM | 13 | earlier, I only read the final presentence investigation |
| 9:17AM | 14 | report, and certainly the attorneys should read the final |
| 9:17AM | 15 | presentence investigation report as well to make sure there's |
| 9:18AM | 16 | no additions, corrections, or changes that might have been made |
| 9:18AM | 17 | based on their contacting you or based on information that you |
| 9:18AM | 18 | have found, but there are some differences in the mental |
| 9:18AM | 19 | health, emotional health, in the two sentence -- or the two |
| 9:18AM | 20 | presentence investigation reports.  In the original one it says |
| 9:18AM | 21 | the Defendant reported to PTS that he attended voluntarily |
| 9:18AM | 22 | counseling in 2016 to address him -- or assist him in |
| 9:18AM | 23 | addressing emotional problems associated with his divorce.  The |
| 9:18AM | 24 | Defendant reported he attended the sessions for three months, |
| 9:18AM | 25 | and the Defendant communicated experiencing general suicidal |

1 ideations during that time, but he never attempted to harm
2 himself.
3 And it's -- it's changed somewhat.  The
4 Defendant reported to PTS that he attended voluntarily --
5 voluntary counseling in 2016, and essentially that paragraph is
6 the same, and so is paragraph 80 incidental to 79.  But then we
7 have records from PCJ.  PCJ is what?
8 **THE PROBATION OFFICER:**  Pinellas County Jail, Your
9 Honor.
10 **THE COURT:**  Pinellas County Jail reflect that the
11 Defendant suffers from unspecified adjustment disorder, and --
12 well, Mr. Futerman --
13 **MR. FUTERMAN:**  81 was included in the previous
14 paragraph on --
15 **THE COURT:**  So you're not objecting to that?
16 **MR. FUTERMAN:**  Not that line, correct.
17 **THE COURT:**  All right.  The records from the Tampa
18 Police Department reveal that on January 13th, 2014, the
19 Defendant was Baker Acted after he made statements he would
20 kill his wife and/or himself, and he was transferred to the
21 Crisis Center.  What is the basis for the statement that he was
22 Baker Acted?
23 **THE PROBATION OFFICER:**  Your Honor, upon initial
24 disclosure of the presentence report, I received records from
25 the Hillsborough County Sheriff with the Baker Act information

9:20AM 1  in the report, so it was subsequently added to the revised PSI

9:20AM 2  or the Court packet.

9:20AM 3  THE COURT:  All right.  And do you have those records

9:20AM 4  with you?

9:20AM 5  THE PROBATION OFFICER:  Yes, Your Honor.

9:20AM 6  THE COURT:  At some point I'm going to ask you -- are

9:20AM 7  they on your computer?

9:20AM 8  THE PROBATION OFFICER:  Yes, Your Honor.

9:20AM 9  MR. MARCET:  Your Honor?

9:20AM 10  THE COURT:  All right.

9:20AM 11  MR. MARCET:  I think these records were filed in this

9:20AM 12  case as well at the original detention hearing as Government's

9:20AM 13  Exhibit 5 and 6 way back in October of 2021.  So these have

9:20AM 14  been -- these were in discovery as well.

9:20AM 15  THE COURT:  Okay.  You don't have a copy of them with

9:20AM 16  you?  I didn't know there was going to be --

9:20AM 17  MR. MARCET:  On my computer as well, Judge.

9:20AM 18  THE COURT:  Okay.

9:20AM 19  MR. FUTERMAN:  I think the distinction -- those

9:20AM 20  original documents I had some familiarity with.  I wasn't there

9:21AM 21  initially, but there wasn't the adjudication finding.  There

9:21AM 22  wasn't any adjudication of Baker Act.  There wasn't any holding

9:21AM 23  in that situation.

9:21AM 24  THE COURT:  I don't know -- I don't understand what

9:21AM 25  you mean holding.  Like, a police officer Baker Acts normally

| | | |
|---|---|---|
| 9:21AM | 1 | or the jail Baker Acts, and they swear out a -- you know, that |
| 9:21AM | 2 | he's a danger to himself or others, and he's taken to the |
| 9:21AM | 3 | hospital or the Crisis Center. |
| 9:21AM | 4 | MR. FUTERMAN: Correct. And then sometimes they're |
| 9:21AM | 5 | quickly released within hours, or there's a hearing and there's |
| 9:21AM | 6 | a determination. I don't know because I never got those |
| 9:21AM | 7 | additional copies that madam probation officer said she |
| 9:21AM | 8 | received. I never got these between 3/16 and today. I've |
| 9:21AM | 9 | never got those additional documents since the initial |
| 9:21AM | 10 | objection, so I don't know what's in them. I'm just echoing |
| 9:21AM | 11 | what Mr. Brown is indicating in the report. When he sees the |
| 9:21AM | 12 | second report, he sees these new paragraphs, he has a different |
| 9:21AM | 13 | slant on things. I don't have either a record -- they probably |
| 9:21AM | 14 | should have been sent to me so I had a chance to look at them |
| 9:21AM | 15 | and discuss them. I think they should be struck. You get |
| 9:22AM | 16 | records and you change the report and add a paragraph, there |
| 9:22AM | 17 | should be some sort of notice. |
| 9:22AM | 18 | THE COURT: There was notice. You had the |
| 9:22AM | 19 | presentence report. |
| 9:22AM | 20 | MR. FUTERMAN: Well, we had, yes, the initial one, |
| 9:22AM | 21 | and then when we received the second -- |
| 9:22AM | 22 | THE COURT: You got the second one, too. |
| 9:22AM | 23 | MR. FUTERMAN: Right. I understand. The second one, |
| 9:22AM | 24 | then I took to Mr. Brown, and he said -- we go through each |
| 9:22AM | 25 | line. So I ask that it be struck. If the Court wants to look |

9:22AM 1    at those documents in camera, I understand.

9:22AM 2            THE COURT:  All right.  In order to look at them in

9:22AM 3    camera, I'm going to have to leave the bench, and so at the

9:22AM 4    first break, I will do that.  Could you tell me --

9:22AM 5            MR. FUTERMAN:  And I don't have an objection to the

9:22AM 6    Court post facto making a decision because it doesn't affect

9:22AM 7    the guidelines on whether they should be in or not.

9:22AM 8            THE COURT:  Oh, okay.

9:22AM 9            MR. FUTERMAN:  I have no objection post-sentencing

9:22AM 10   because it doesn't affect --

9:22AM 11           THE COURT:  So I can go back after sentencing --

9:22AM 12           MR. FUTERMAN:  Yes.

9:22AM 13           THE COURT:  -- and look at them, and if I think

9:22AM 14   there's not sufficient evidence to put it in there, take it

9:22AM 15   out.

9:22AM 16           MR. FUTERMAN:  Absolutely.

9:22AM 17           THE COURT:  All right.  Mr. Goedman, again, give me

9:23AM 18   the document numbers that you think they've been filed in.

9:23AM 19           MR. MARCET:  Mr. Goedman, unfortunately, is not with

9:23AM 20   us.

9:23AM 21           THE COURT:  Where is Mr. Goedman?

9:23AM 22           MR. MARCET:  He is on maternity leave.

9:23AM 23           THE COURT:  All right.

9:23AM 24           MR. MARCET:  It's document 17-12 and 17-13, according

9:23AM 25   to Ms. Asokan, who just pulled it up on her phone.

**THE COURT:** Okay. Thank you. I can go back and look it up. All right. Thank you.

The other objection, again, that doesn't affect the guidelines, but I did want to at some point ask about it as well has to do with the -- well, I'd refer to it as a GoFundMe account, but it's actually described in the presentence report as GiveSendGo, and it's $169,925 that apparently has been raised in online fundraising, and I'm somewhat familiar with this because this was an issue in front of the magistrate judge where Mr. Brown had to reimburse the treasury of the Court for his Court-appointed attorney, and he objected to that and actually was held in contempt, I think, before he would do it. And so there was testimony about -- from a lawyer that I was unfamiliar with, about a trust, and -- but obviously it was able to -- he got into the trust to pay the funds into the court, but -- so I'm not sure. You say this is a trust, but it's not related to him at all?

**MR. FUTERMAN:** What Mr. Brown has indicated to me is it's a trust not controlled by him in any way. So it is controlled by his girlfriend, but they're not married, and so I don't think as a matter of law we can count that as an asset. If Ms. Aldridge decides today that she's breaking up with Mr. Brown and decides to spend the funds as the trustee in any way, those are no longer assets. I don't anticipate that happening obviously, but just as a matter of law, I don't think

9:25AM 1    you can hold someone else as an asset when you don't control

9:25AM 2    the trust.

9:25AM 3          THE COURT:  Okay.  So essentially -- let me just make

9:25AM 4    sure I understand this because obviously I wasn't involved when

9:25AM 5    the magistrate judge was handling this.  This is essentially a

9:25AM 6    fund that I'm familiar with, they call GoFundMe funds, where

9:25AM 7    someone -- or people have given money to Mr. Brown for what?

9:25AM 8          MR. FUTERMAN:  And I wasn't involved in that either.

9:25AM 9    This was prior counsel, so I'm not infinitely familiar with

9:25AM 10   that past procedure or the trust rules as it relates.  I am

9:25AM 11   familiar with Judge Flynn's ruling in the particular case and

9:25AM 12   Ms. Aldridge reimbursing that account -- that money from

9:25AM 13   different avenues.

9:25AM 14          This, my understanding is that -- like the

9:25AM 15   Court's aware, we both have the same common understanding -- is

9:25AM 16   a Go Raise Me fund.  People donate.  It can be used for

9:26AM 17   different legal fees, I believe.  I believe, as indicated, he

9:26AM 18   has hired Mr. Ufferman, who is a very respected lawyer out of

9:26AM 19   Tallahassee.  I have not had a discussion with him how much

9:26AM 20   he's charged.  There are transcript costs that I know

9:26AM 21   Ms. Aldridge has been paying for and various other things.  I

9:26AM 22   don't know exactly how that money is being used other than for

9:26AM 23   his appellate defense and legal fees and various other things.

9:26AM 24   So when I saw it and discussed it, I don't think it can be

9:26AM 25   counted as an asset unless he controls it, unless he's the

9:26AM 1 legal trustee.  I don't know if you wanted to take any

9:26AM 2 testimony about his control of that.  I think you can -- you

9:26AM 3 can raise funds on behalf of John Smith, but if Jim Smith is

9:26AM 4 the one that controls it, John Smith can't count that as an

9:26AM 5 asset.

9:26AM 6        **THE COURT:**  Well, are the funds raised for

9:26AM 7 Mr. Brown's legal fees, his defense?  Is that what they're for?

9:27AM 8        **MR. FUTERMAN:**  I believe so.  That's what I've been

9:27AM 9 told they are raised for, yes, appellate fees, yes.

9:27AM 10        **THE COURT:**  All right.  That's interesting that there

9:27AM 11 would be $169,000 in there.

9:27AM 12        All right, Mr. Marcet, what's your position as

9:27AM 13 to whether it should be listed as an asset?

9:27AM 14        **MR. FUTERMAN:**  Before Mr. Marcet responds, let me

9:27AM 15 just be clear, I don't know because I saw this -- because I've

9:27AM 16 heard different versions of how much actual liquid is still in

9:27AM 17 that fund.  I don't know where probation got that from.  I

9:27AM 18 don't know if there's any money left.

9:27AM 19        **THE COURT:**  Good idea.  Let's start there, and then

9:27AM 20 I'll come to you, Mr. Marcet.  Let me ask the probation

9:27AM 21 officer, where does the information that he has an asset, an

9:27AM 22 online funding platform, GiveSendGo, and there is $169,925 in

9:27AM 23 that?

9:27AM 24        **THE PROBATION OFFICER:**  As of the date of this

9:27AM 25 report, Your Honor, if you go to the GiveSendGo website, that's

9:28AM 1 the amount that was listed under Mr. Brown.  That's where that

9:28AM 2 amount came from.  It could have adjusted between now and the

9:28AM 3 30th when this report was filed -- or the 29th.

9:28AM 4     THE COURT:  Okay.  But other than the amount, is

9:28AM 5 it -- you wouldn't have any information on how it's held or

9:28AM 6 anything like that?

9:28AM 7     THE PROBATION OFFICER:  No, Your Honor.

9:28AM 8     THE COURT:  Okay.  Thank you.

9:28AM 9     MR. FUTERMAN:  And I also think for clarification --

9:28AM 10 maybe Ms. Campbell can agree with this.  I think that's the

9:28AM 11 tally versus what's actually been expended out of there.

9:28AM 12     THE PROBATION OFFICER:  I can only see what's in the

9:28AM 13 account, Your Honor.  I can't see how any amount is expended or

9:28AM 14 anything of that nature.

9:28AM 15     THE COURT:  Okay.  So when you looked there was

9:28AM 16 $169,925 in there?

9:28AM 17     THE PROBATION OFFICER:  Correct, Your Honor.

9:28AM 18     THE COURT:  Okay.

9:28AM 19     MR. FUTERMAN:  That is what's been collected, not

9:28AM 20 what's in the account.

9:28AM 21     THE COURT:  Is that what's been collected or what's

9:28AM 22 in the account?

9:28AM 23     MR. FUTERMAN:  The tally.

9:28AM 24     THE PROBATION OFFICER:  Your Honor, I don't want to

9:28AM 25 speak on that.  This is my first time ever seeing a GiveSendGo.

As you stated, I'm familiar with GoFundMe, so this was
completely different, Your Honor.  So I don't want to speak on
something I don't really have knowledge on.

        **THE COURT:**  Okay.

        **THE PROBATION OFFICER:**  Except that --

        **THE COURT:**  Let me ask you, Mr. Futerman, how much is
in the account at this point?

        **MR. FUTERMAN:**  I don't want to make that
representation specifically, but my understanding in receiving
some -- maybe Ms. Aldridge, who is the trustee, could maybe
give some better information about that, but I don't believe --
I think that's what's been tallied and collected.  She's the
trustee.  She could tell you how much is actually left in that
account if you want to take testimony from her.

        **THE COURT:**  Okay.

        **MR. FUTERMAN:**  So I don't want to make that
representation.

        **THE COURT:**  Okay.  So you don't think it's $169,000.
You think it's less than that?

        **MR. FUTERMAN:**  I don't know if there's very much left
in that account period.  From what I've been told before the
hearing, I don't believe there is very much left, but I'd
rather have direct testimony from her.

        **THE COURT:**  Okay.  Thank you.  Thank you.

        **THE PROBATION OFFICER:**  I'm sorry, Your Honor.  I

9:29AM 1 don't know if you -- I don't know the procedure, but I just

9:29AM 2 pulled up the account, and the amount actually says, "Raised,

9:30AM 3 181,435." So the amount is different today as far as what's

9:30AM 4 raised.

9:30AM 5 THE COURT: So that's the amount raised.

9:30AM 6 THE PROBATION OFFICER: Correct.

9:30AM 7 THE COURT: Okay. All right.

9:30AM 8 Mr. Marcet, what's the position of the United

9:30AM 9 States as far as whether this should be listed as an asset of

9:30AM 10 the Defendant's?

9:30AM 11 MR. MARCET: I think in terms of whether the money in

9:30AM 12 the account is his asset, I think it is. We don't know -- I

9:30AM 13 mean, I think Judge Flynn determined that long ago when he held

9:30AM 14 Mr. Brown in contempt for not depositing money from the trust

9:30AM 15 which he controlled. And Ms. Asokan and Ms. Krigsman spent

9:30AM 16 many, many hours litigating that issue in front of Judge Flynn,

9:30AM 17 and they can speak more on his findings if Your Honor is

9:30AM 18 interested in that.

9:30AM 19 I do think obviously if a bulk of the money has

9:30AM 20 been spent on attorney's fees, then the number would be lower.

9:30AM 21 It wouldn't be 169, or could be higher. It could be 181 now.

9:31AM 22 And I'll say I don't intend to ask for a fine. I don't intend

9:31AM 23 to --

9:31AM 24 THE COURT: Okay.

9:31AM 25 MR. MARCET: But I will say what does concern me is

| | |
|---|---|
| 9:31AM | 1 |
| 9:31AM | 2 |
| 9:31AM | 3 |
| 9:31AM | 4 |
| 9:31AM | 5 |
| 9:31AM | 6 |
| 9:31AM | 7 |
| 9:31AM | 8 |
| 9:31AM | 9 |

that the Defendant owes nearly $22,000 in child support
arrearage, and I would ask that the Court incorporate some --
some condition of supervised release that he try to pay his
child support arrearage, and if he does have tens of thousands
of dollars available to him, that would be relevant down the
line as to whether he's complying with his supervised release.
But apart from that, I don't intend to ask for a fine.  There's
no -- this isn't a fraud case.  There's not going to be any
financial forfeiture or anything like that.

MR. FUTERMAN:  And he certainly doesn't have an
objection.  He's going to do everything he can to pay child
support on supervised release, so that's not an issue either
for us.

THE COURT:  Okay.  So the objection is -- what is the
objection?  Is the objection as to the amount, or listing it
period under the assets?

MR. FUTERMAN:  Listing it period as an asset.

THE COURT:  Do you have any objection to my removing
it, Mr. Marcet?

MR. MARCET:  No, Your Honor.

THE COURT:  Okay.  Then we'll take it out.  That was
easy enough.

All right.  And it would have become an issue
had I imposed or was I going to impose a fine, but the
Government is not seeking a fine, and it would become an issue

9:32AM 1   if the Defendant was going to object to a condition that he pay

9:32AM 2   child support -- the child support amount that he owes, but

9:32AM 3   since you're not objecting to that, then we'll pull it out.

9:32AM 4           And I will go back and check the records on the

9:32AM 5   mental and emotional health, and if I think something needs to

9:32AM 6   be corrected in the final presentence investigation report,

9:32AM 7   I'll alert the probation officer to make that correction.

9:32AM 8           Okay.  Mr. Futerman, I think those were the two

9:32AM 9   issues that were not brought up in the addendum.  Did we get

9:33AM 10   both of them?  Are those two --

9:33AM 11        MR. FUTERMAN:  You did, Your Honor.

9:33AM 12        THE COURT:  All right.  Then let's talk about the

9:33AM 13   objections that you do have.  One, the obstruction of justice,

9:33AM 14   which is a substantive objection because it does affect the

9:33AM 15   advisory guidelines; the other, the information about the Oath

9:33AM 16   Keepers, which really has no effect on the guidelines at all.

9:33AM 17   But -- so I'll let you go ahead and begin.

9:33AM 18        MR. FUTERMAN:  Thank you, Your Honor.  And I won't

9:33AM 19   spend long expanding upon what I've written in the memorandum.

9:33AM 20   I've advised Mr. Brown the normal course in my experience in

9:33AM 21   the Middle District that -- and probably most federal

9:33AM 22   jurisdictions, that if a defendant testifies and the jury comes

9:33AM 23   back with an adverse ruling, there is often a presumption to

9:33AM 24   put obstruction, and I've always maintained that objection,

9:33AM 25   that maybe the jury gets it wrong, and the Defendant wasn't

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
| 9:33AM | 1  | lying, and then the obstruction wouldn't apply because it's      |
| 9:33AM | 2  | obviously based on essentially the premise of the jury finding   |
| 9:34AM | 3  | is the thrust of it.  So I just make that same objection; that   |
| 9:34AM | 4  | I see obstruction, true obstruction if the Defendant tries to    |
| 9:34AM | 5  | pull witnesses or tries to obstruct the course of justice or     |
| 9:34AM | 6  | does something in the courtroom that's obstructive.  I think we  |
| 9:34AM | 7  | can all agree that during the trial, during your observations    |
| 9:34AM | 8  | of Mr. Brown, he's acted as a gentleman.  He's always been       |
| 9:34AM | 9  | polite.                                                          |

10          THE COURT:  I agree with that.

11          MR. FUTERMAN:  And so I make the objection for the
12   record.  Although it's generally applied, I just hope one day
13   the Eleventh Circuit says just because a jury disagrees with
14   the jury findings, it's not obstruction.

15          THE COURT:  All right.  Mr. Marcet?

16          MR. MARCET:  Your Honor, as we laid out in our
17   original memorandum, we'd ask that you make the detailed
18   finding required by the Eleventh Circuit to support this
19   enhancement.  Here the Defendant looked the jury in the eyes
20   and repeatedly lied and lied and lied.

21          And it's not just the jury's verdict that shows
22   that.  It's the other evidence.  The Defendant claimed he'd
23   never seen these grenades before, but he admitted he owned the
24   vest that they were in, and the agents testified credibly, as
25   the jury found, that the grenades were in his vest that he

owned.  The Defendant also had access to the exact kind of grenades as his role as a weapons sergeant in the military.  He had the training necessary to take those grenades.  Nobody else with access to that RV had those same qualifications.  Those were the Defendant's grenades, he knew they were there, and that's what the jury verdict shows.

And the same with respect to Count 10.  The Defendant testified that he had removed all the classified information.  His story was completely nonsensical as I went in some detail in the -- in the sentencing memo, but it's simple enough just to point to the fact that the classified information expert testified in paragraph by paragraph that virtually every paragraph of that document still had classified information in it, and the jury credited that testimony beyond a reasonable doubt.

So the Defendant's testimony was false, it was material, it was made under oath, and it was designed to obstruct justice.

THE COURT:  Okay.  And in answer -- in addressing your comment regarding when someone goes to trial, this is a normal enhancement.  Only if they take the stand and lie is it a -- is it an enhancement, and then in this case, as Mr. Marcet pointed out, the jury found the Defendant guilty of possession of the two grenades.  And Mr. Brown -- I went back and read Mr. Brown's testimony just so I would be sure.  He testified on

| | |
|---|---|
| 9:36AM | 1 |
| 9:36AM | 2 |
| 9:36AM | 3 |
| 9:36AM | 4 |
| 9:36AM | 5 |

two occasions, "I've never seen those grenades," and before
Defendant even received discovery in the case, "I proclaimed
they were not my grenades, and, again, no, I've never seen
those grenades."  The jury found beyond a reasonable doubt that
he possessed those grenades in Counts 3 and 4, I believe.

And his testimony only suggests that they were
planted by someone, and I'm sure the suggestion was that they
were planted by law enforcement because how else could they
have been there?  But at any rate, it was an intent to mislead
the jury and obstruct justice.  And, as I said, the jury found
beyond a reasonable doubt that they were his grenades, at least
to the extent that he possessed them since they were in his RV
and in his -- or the RV that he has -- it's actually his
girlfriend's RV, but he drives the RV because apparently she
doesn't drive the RV.  So -- and it's a mutual RV, for want of
a better word.

And also I would agree that the other issue that
he testified falsely about at trial was the trip report, and I
believe that was Count 10, and he says -- in answer to
either -- and I didn't write this down -- the Government's
question or in answer to Mr. Futerman's question -- but anyway,
I wrote the page number down, 165, line 14.  "And you did not
tell the agents that you had this?"  And his answer was, "No,
because the agents asked if I had a classified -- if I had
classified material, and this document is not classified

material."  And obviously, the testimony from the expert was it
was classified material, and the jury believed that and
credited that.

          So on two occasions he attempted -- at least
those two occasions -- to mislead the jury and was not
truthful.  So I think the obstruction of justice applies in
this case.

          Now, what is -- what's the really reason because
I don't think -- even by your own admission, Mr. Futerman, he
said he was a member of the Oath Keepers.  Now there may be
some dispute about how much time, but what's your dispute about
having it in the presentence report?

          MR. FUTERMAN:  I think in further communications with
Mr. Brown, I think he was -- he agreed he was a member for
about a month prior to law enforcement contacting him and
asking him to work for law enforcement.  I think his
characterization about the organization he has an objection to.
And so I'm just echoing -- it's a de minimis, relatively de
minimis aspect of the sentence, someone's characterization of a
group you were a member of for a month, but he did want me to
at least explain to that; that he didn't agree with the
characterization, and I'll leave it at that, Your Honor.

          THE COURT:  Okay.  Mr. Marcet?

          MR. MARCET:  I think this is an accurate description
of the Oath Keepers.  We do have a witness who can testify to

that effect, but if there's a particular phrase or something

that Mr. Brown is objecting to that he believes is not

accurate, but, I mean, I think this is how the Oath Keepers

widely describe themselves. I don't think it's particularly

argumentative.

      **THE COURT:** Okay. Well, paragraph number 75 does

state that discovery material revealed that the Defendant was a

member of the Oath Keepers group period, and he stated he was a

member of the Oath Keepers group for a short period of time.

And then the footnote goes on to describe what the Oath Keepers

is, and I appreciate it, for whoever's benefit is reading the

presentence report. The Oath Keepers is a large but loosely

organized collection of individuals, some of whom are

associated with militias. Some members of the Oath Keepers

believe that the federal government has been coopted by a

shadowy conspiracy that is trying to strip American citizens of

their rights. The Oath Keepers will accept anyone as members.

They explicitly focus on recruiting current and former

military, law enforcement, and first responder personnel. The

organization's name alludes the oath sworn by members of the

military and police to defend the Constitution and judges from

all enemies, foreign and domestic.

      So I don't mind taking the footnote out if

that's what you would like me to do.

      **MR. FUTERMAN:** Thank you, Your Honor.

| | | |
|---|---|---|
| 9:41AM | 1 | **THE COURT:** I'll strike the footnote. It's I guess |
| 9:41AM | 2 | primarily for my benefit anyway in case I don't know about it, |
| 9:41AM | 3 | but I do, and I'm going to leave the paragraph in. |
| 9:41AM | 4 | Okay. The Government had no objections to the |
| 9:41AM | 5 | facts or the guidelines. I may have asked this; is that |
| 9:41AM | 6 | correct, Mr. Marcet? |
| 9:41AM | 7 | **MR. MARCET:** It is, Your Honor. |
| 9:41AM | 8 | **THE COURT:** Okay. So we're now going to proceed to |
| 9:42AM | 9 | sentencing in the case, and what will help -- I would like to |
| 9:42AM | 10 | do this -- is that the advisory guidelines as we now -- since |
| 9:42AM | 11 | I've overruled the objection to the obstruction of the justice, |
| 9:42AM | 12 | are, as the probation officer has computed them, total offense |
| 9:42AM | 13 | level is a 29, criminal history I. Range of imprisonment is 87 |
| 9:42AM | 14 | months to 108 months. |
| 9:42AM | 15 | And according to the memorandum that the defense |
| 9:42AM | 16 | filed, they are seeking a sentence below the advisory |
| 9:42AM | 17 | guidelines, and according to the memorandum the Government |
| 9:42AM | 18 | filed, they're seeking a sentence at the top of the guidelines. |
| 9:42AM | 19 | So we're in two different places. |
| 9:42AM | 20 | So, Mr. Futerman, I'm going to let you begin, |
| 9:42AM | 21 | and you can make any argument you'd like to make. You can call |
| 9:43AM | 22 | any witnesses you'd like to call that might go to what a proper |
| 9:43AM | 23 | sentence should be in this case and whether I should vary |
| 9:43AM | 24 | downward, and I'll let you begin. |
| 9:43AM | 25 | **MR. FUTERMAN:** Thank you, Your Honor. Your Honor, I |

9:43AM 1  had some brief argument and extension or expansion from the

9:43AM 2  memorandums which I know the Court's obviously read before now,

9:43AM 3  so I won't be repetitive to that.  But I think it is worth

9:43AM 4  stressing some of the micro factors or the macro factors I

9:43AM 5  brought up in the memorandum.

9:43AM 6            20 years serving the country with risking life

9:43AM 7  and limb in the Special Forces, and in the previous document

9:43AM 8  filed as Exhibit B on the defense's memorandum, in the small

9:43AM 9  print is the extent of bravery that Mr. Brown exhibited while

9:43AM 10  serving this country.  And this is not a -- just a general

9:43AM 11  soldier who didn't serve in combat.  And I point to the

9:43AM 12  Exhibit B in terms of, first of all, when you look at remarks,

9:44AM 13  during his illustrious, brave career, there is a line in

9:44AM 14  paragraph 18 of our Exhibit B of the memorandum that says,

9:44AM 15  "Served in designated imminent danger pay area.  Served in

9:44AM 16  Afghanistan, served in Bolivia, served in Columbia, served in

9:44AM 17  Malaysia, served in Iraq."  And multiple times not only has he

9:44AM 18  witnessed awful things -- that luckily many of us have been

9:44AM 19  spared from seeing -- he put his own self at risk, and that's

9:44AM 20  noteworthy.

9:44AM 21            And what's noteworthy is then the actual medals:

9:44AM 22  Bronze star medal, commendation medal, service achievement

9:44AM 23  medal, achievement medal, service medal, expeditionary medal.

9:44AM 24  I think there was a couple of bronze stars.

9:44AM 25            And that's what I've never seen in my

experience -- I'm sure the Court has -- is then esteemed members of our national -- people that we look up to write letters on behalf of Mr. Brown.  Not just friends and family members, which you see all the time, not his mother that you're going to hear from, but members of the United States Congress and members of the State Representatives of this Florida jurisdiction, and I think that's noteworthy.  They know the facts.  This has been a well publicized case.  They know Mr. Brown's statements.  Mr. Brown has given many podcasts from the jail, many interviews from the jail.  Yet they went out on a limb.

And I think it's worth just highlighting a couple of comments from different United States Congressmen and State Representatives.  And I'm just going to highlight three letters.  One was Exhibit E from Congressman Luna, who indicated, "Mr. Brown served our country honorably for 20 years and retired an E-8 master sergeant, a level of advancement only achieved by the highest caliber soldiers serving in the already elite ranks of Special Forces.  Mr. Brown voluntarily chose to dedicate the best years of his life," and I think the testimony was he was about 18 when he went into the military --

**THE COURT:**  Right out of high school.

**MR. FUTERMAN:**  Right out of high school, right.  "To serve our great nation, making countless sacrifices while striving to uphold the standards of the best learned soldiers

9:46AM 1 in the United States military." And finally, Congressman Luna

9:46AM 2 says, "As American citizens who enjoy the fruits of those

9:46AM 3 sacrifices, I believe we would be remiss if we did not consider

9:46AM 4 Mr. Brown's service and sacrificing -- and sacrifice," excuse

9:46AM 5 me, "when deciding his fate," and addresses that directly to

9:46AM 6 the Honorable Judge Bucklew.

9:46AM 7 The second letter from United States Congressman

9:46AM 8 Bilirakis indicates that he was a former Vice-Chairman of the

9:46AM 9 U.S. House of Representatives Committee on Veterans' Affairs.

9:46AM 10 THE COURT: Meaning Congressman Bilirakis.

9:46AM 11 MR. FUTERMAN: Yes, Your Honor. Also attached as one

9:46AM 12 of my additional exhibits I think that was received after

9:46AM 13 initial memorandum, I quote, "I constantly find myself in awe

9:47AM 14 of the sacrifices and efforts that have been made on behalf of

9:47AM 15 our great country, by the men and women who have worn the

9:47AM 16 uniform of the armed services. He was part of an elite group

9:47AM 17 of soldiers who undertook activities in defense of America that

9:47AM 18 required exceptional courage, discipline, and devotion to the

9:47AM 19 country. He was raised by his grandfather, who was a Navy

9:47AM 20 veteran and served in World War II. He has lived an exemplary

9:47AM 21 life with no incidents of violence and no criminal history.

9:47AM 22 After he tragically lost his brother to suicide, Jeremy

9:47AM 23 immediately stepped in to raise his nephew after being granted

9:47AM 24 legal custody." He asked the Court, "In determining an

9:47AM 25 appropriate sentence for someone with no prior criminal record

who served his country honorably."

I think those are very strong, noteworthy statements from someone I think we all have a lot of respect for.

And then finally, from Berny, Florida House Representative, Jacques, he wrote to the Court recently and what he said just in one sentence I think is important. "As a Green Beret, Mr. Brown was deployed four times to combat zones and was twice awarded the bronze star. I've been -- finally, I've been very impressed by the accounts of Mr. Brown's great conduct while incarcerated during the case. Many have described Mr. Brown as a model prisoner."

And that is something also that's I think noteworthy to the Court; not only how he has behaved in front of you, in front of the trial. In an emotional trial, we didn't have any outbursts. We didn't have any reactions. We didn't have any of that.

THE COURT: I agree.

MR. FUTERMAN: But also how he's conducted himself in the jail. I often unfortunately at sentencing have the State Attorney's Office or sometimes the federal government see disciplinary reviews, DRs, fights, different things even in jail that shows that he was obstructionist in the jail or made it difficult with the people that were looking after him. This has been far from it. Everyone has wished him well. Whenever

I visited him, the deputies and the marshals and the people inside of custody have wished him well.

And while people may have different views of the facts and what he did, his behavior postarrest I think is something for the Court to consider as the representative indicated, in addition to the other factors that I mentioned to the Court.

The Government does say in its response that we should kind of discourage and not take into account all these great efforts because in 2011 he was reprimanded and not allowed to enlist because he uploaded files which clearly contained music videos primarily and other videos and some images of some women, and they called it pornographic, which they were, and it was wrong when he changed servers, as you heard, that those got uploaded. He got reprimanded.

**THE COURT:** It was a pretty strong reprimand, so it must have been a fairly egregious event.

**MR. FUTERMAN:** Well, it's something he shouldn't have done obviously. You shouldn't upload music videos or images of women of course, absolutely. And when the transfer went over, he should have been cognizant of that. And as a consequence, he was honorably discharged, but not allowed to reenlist, and that was back in 2011.

But I think the Government gives a lot more emphasis on that act in comparison to the 20 years that he

9:50AM 1   served this country, and I think that we don't want that

9:50AM 2   blemish to take away what are unusual actions.  You don't see

9:50AM 3   before you for sentencing someone with this type of level of

9:50AM 4   bravery for 20 years, this level of sacrifices for 20 years.

9:50AM 5   You just don't see that -- I don't see that -- from the Special

9:50AM 6   Forces.  And hence, the --

9:50AM 7          THE COURT:  I don't either.  I agree with that.

9:50AM 8          MR. FUTERMAN:  Right.  And I don't have any other

9:50AM 9   additional argument in support of the variance down.

9:51AM 10          3553 factors, I'd ask the Court to strongly

9:51AM 11   consider the factors, and the history and the characteristics

9:51AM 12   is I think one of the most important things for the Court to

9:51AM 13   look at.

9:51AM 14          And I do have a few -- just four witnesses that

9:51AM 15   would like to address the Court.  Some of them have written

9:51AM 16   letters to the Court, so they may be duplicate, in essence.

9:51AM 17   One of them is his mother, who has not written.  She's given

9:51AM 18   some scribbled notes, so I'll see what she says.  And then

9:51AM 19   after the Government responds, Mr. Brown would like to briefly

9:51AM 20   allocute before you sentence him.

9:51AM 21          THE COURT:  All right.

9:51AM 22          MR. FUTERMAN:  Thank you, Your Honor.  So the first

9:51AM 23   person I'd like to call is Meredith Olsen.  Ms. Olsen is the

9:51AM 24   wife of the Special Forces witness who testified in court.

9:51AM 25          THE COURT:  I recall.

9:51AM 1      **MR. FUTERMAN:**  If she could come forward, Your Honor.

9:51AM 2      **THE COURT:**  Ms. Olsen, if you'll come forward,

9:51AM 3 please.  Ms. Olsen, nothing personal, but it's hard to see you

9:51AM 4 over that screen.

9:52AM 5      **MR. FUTERMAN:**  Do you want her to stand over here and

9:52AM 6 I'll move back?

9:52AM 7      **THE COURT:**  I don't know.  Are you going to show a

9:52AM 8 video or anything?

9:52AM 9      **MR. FUTERMAN:**  No.

9:52AM 10      **THE COURT:**  Okay.  Does it fold down, Ms. Black?

9:52AM 11      **COURTROOM DEPUTY:**  The one at the podium?

9:52AM 12      **THE COURT:**  The screen.

9:52AM 13      **COURTROOM DEPUTY:**  Not at the podium, Judge.

9:52AM 14      **THE COURT:**  Not the one on the podium?

9:52AM 15      **COURTROOM DEPUTY:**  No.

9:52AM 16      **THE COURT:**  Okay.

9:52AM 17      **COURTROOM DEPUTY:**  She can stand at the side, Judge.

9:52AM 18      **THE COURT:**  What?

9:52AM 19      **COURTROOM DEPUTY:**  She can stand at the side.

9:52AM 20      **MR. FUTERMAN:**  Okay.  It picks up the sound on the

9:52AM 21 side apparently.

9:52AM 22      **THE COURT:**  I can see you at the side.  All right.

9:52AM 23 Would you swear her in, please?

9:52AM 24      **COURTROOM DEPUTY:**  Yes, Your Honor.  Please raise

9:52AM 25 your right hand.

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
| 9:52AM | 1  | (Witness sworn.)                                          |
| 9:52AM | 2  | **COURTROOM DEPUTY:** Please state your name for the     |
| 9:52AM | 3  | record and spell your name.                              |
| 9:52AM | 4  | **MS. JONES:** Meredith Jones, M-e-r-e-d-i-t-h, and last |
| 9:52AM | 5  | names Jones, J-o-n-e-s.                                  |
| 9:52AM | 6  | **COURTROOM DEPUTY:** Thank you.                         |
| 9:52AM | 7  | **THE COURT:** Ms. Jones, I'm assuming you're going to   |
| 9:52AM | 8  | do this, but one of the first things you need to tell me is, |
| 9:52AM | 9  | even though Mr. Futerman has kind of told me, how you know |
| 9:53AM | 10 | Mr. Brown.                                               |
| 9:53AM | 11 | **MS. JONES:** Yes, Your Honor. So my view of Jeremy     |
| 9:53AM | 12 | has been shaped over a decade. I've known Jeremy through my |
| 9:53AM | 13 | husband who served with him in the military in Special Forces. |
| 9:53AM | 14 | My husband served 27 years in Special Forces and retired at the |
| 9:53AM | 15 | highest enlisted rank. He knows Jeremy well, and I know Jeremy |
| 9:53AM | 16 | through him, through that introduction. But my opinion of |
| 9:53AM | 17 | Jeremy is my own, and it's shaped by my individual interactions |
| 9:53AM | 18 | with Jeremy and what I've observed over the years, and I feel |
| 9:53AM | 19 | it's important for me to share that with the Court because |
| 9:53AM | 20 | you've seen just a small snapshot of who Jeremy is, and I would |
| 9:53AM | 21 | like to kind of share that longer prospective.              |
| 9:53AM | 22 | **THE COURT:** I'm sorry. No sitting on the floor.       |
| 9:53AM | 23 | People have to sit in -- in seats. If there's not enough room, |
| 9:53AM | 24 | there's not enough room.                                  |
| 9:53AM | 25 | Okay. I'm sorry I interrupted you. Go ahead.             |

**THE WITNESS:**  So with that, I want to first say that I have been over the years very impressed by Jeremy's character, and for me to say that says a lot.  Jeremy does not take the easy way out, and, Your Honor, you may have seen this in court.  Jeremy is very principled, very insistent.  One example that did come out in court is when Jeremy was encouraged to lie -- and several people had encouraged him to lie -- he refused.  This is perhaps frustrating to some, but I do understand that that is why Jeremy readily admitted to the two weapons charges that were in front of him, and that's also why I believe when he said he was not guilty of other ones, that he was not, in fact, lying.  As hard as that may have been to believe for a jury, my experiences with Jeremy over the years would lead me to also believe him.

**THE COURT:**  Okay.  It doesn't do any good for you to talk about whether the jury was right or wrong, and you may believe it, but the main thing was what the jury believed.

**MS. JONES:**  I understand.  I understand.  That more speaks to I think the idea of obstruction, but I'm not here to argue or debate; just to present what I understand, what I believe.

Now, I will say one of the other things that Jeremy does is he's consistently served the community.  He's done a lot.  He's been a voluntary EMT, firefighter.  He's worked with so many different people, and even in the jail, it

didn't surprise me to learn that he was trying to help his
fellow inmates by counseling them, talking to them, encouraging
them, encouraging them to change their lives.  So that does not
surprise me at all.  That is who Jeremy is, and that's
consistent with my experiences with him over the years.

I would say some of Jeremy's most frustrating
traits are probably also his best.  I understand that when
you're looking at sentencing, remorse is one of those things,
and I understand that Jeremy is probably going to continue to
insist on his innocence, and I know that that's frustrating,
and it may seem defiant, but my understanding of Jeremy is that
that principled approach and that commitment to truth would
lead him to simply not compromise when he does know the truth.
And really only Jeremy knows what the truth is.

Now, I have had over the years many ideological
and political debates with Jeremy.  We do not see eye to eye
politically on a number of issues, but one thing we do see eye
to eye on is his view on nonviolence, which I share.  Jeremy
over the years, one might think, would have been pro-war and
pro-violence as an approach, but his military service has led
him to denounce violence all together.  I can confidently say,
Your Honor, that Jeremy would never commit an act of violence
against another individual.  It would take only the most
extreme circumstance of life and death for Jeremy to actually
act, even in self-defense.  That's how Jeremy is, and that's

his behavior, and I believe you've seen that as well over the course of the trial in how he's behaved himself, even in prison.

Now, Jeremy, of course, has no history of violence. If he were to be out in society, I certainly would not fear. Even as the petite little person that I am, I would not fear in any way. In fact, I would look forward to the good that Jeremy could do in society, which is what he was doing in many ways. He received a recognition from the Sheriff's Office in Pinellas County for all of the work that he had done over the years. And, again, that is who Jeremy is.

I would just ask that you consider his -- the totality of his character when you decide sentencing and understand that of all the people in prison -- I believe that Jeremy can do a lot of good in prison, but I believe there's a lot more good that he can do if he were free.

THE COURT: Thank you.

MR. FUTERMAN: Your Honor, I believe that there's two other people before his mother that would like to speak. One is Cathi Chamberlain, who has written the Court a letter before. Ms. Chamberlain, come forward.

THE COURT: I'm going to ask the courtroom deputy to swear you in.

MS. CHAMBERLAIN: Yes.

COURTROOM DEPUTY: Please raise your right hand.

9:58AM 1                        (Witness sworn.)

9:58AM 2              **COURTROOM DEPUTY:**  Please state your name for the

9:58AM 3     record and spell your name.

9:58AM 4              **MS. CHAMBERLAIN:**  Cathi Chamberlain, C-a-t-h-i,

9:58AM 5     C-h-a-m-b-e-r-l-a-i-n.

9:58AM 6              **COURTROOM DEPUTY:**  Thank you.

9:58AM 7              **MS. CHAMBERLAIN:**  Good morning, Your Honor.

9:58AM 8              **THE COURT:**  Good morning.

9:58AM 9              **MS. CHAMBERLAIN:**  And thank you for the opportunity

9:58AM 10    to allow me to speak in defense of Jeremy Brown.

9:58AM 11                   As an investigative researcher and author, I

9:58AM 12    know there are always two sides to every story.  The truth

9:59AM 13    means everything to me.

9:59AM 14             **THE COURT:**  Can you tell me how you know Jeremy

9:59AM 15    Brown?

9:59AM 16             **MS. CHAMBERLAIN:**  Yes, I was just on that one.

9:59AM 17             **THE COURT:**  Okay.

9:59AM 18             **MS. CHAMBERLAIN:**  When I interviewed Jeremy Brown on

9:59AM 19    my podcast before his arrest, my interest was more about the

9:59AM 20    fairness of our criminal justice system than about him, who I

9:59AM 21    hardly knew at that time.  Since then, I've learned way more

9:59AM 22    than I bargained for, and I found Mr. Brown to be honest to a

9:59AM 23    fault.  His distinguished and undeniably honorable military

9:59AM 24    career of 20 years has been irreparably tarnished since his

9:59AM 25    arrest.

9:59AM   1        Having never been arrested of a crime before

9:59AM   2  now, he spent his first 14 months in maximum security while

9:59AM   3  still considered innocent, or at least should have been.  To

9:59AM   4  the thousands following his story, something feels seriously

9:59AM   5  wrong with this treatment.  Many are shocked by how the justice

9:59AM   6  system we grew up to trust now operates.

10:00AM   7        At the beginning of his trial, we were promised

10:00AM   8  to be shown how evidence was planted during the raid on his

10:00AM   9  home as Jeremy has maintained from the beginning and how the

10:00AM  10  Government was retaliating against him for becoming a

10:00AM  11  whistleblower against their attempts to recruit him as a spy.

10:00AM  12  We saw none of that in the trial.  Instead, we heard stories

10:00AM  13  meant to make us believe Mr. Brown is a threat to society.  His

10:00AM  14  supporters were not fooled.  Grenades that Jeremy has

10:00AM  15  consistently denied were his since the beginning that the FBI's

10:00AM  16  own forensics lab failed to tie to him, and that the military

10:00AM  17  itself never charged him with stealing simply defies logic for

10:00AM  18  me.

10:00AM  19        And to find him guilty of being in possession of

10:00AM  20  a classified document that was merely a template of the real

10:01AM  21  deal, according to him -- and I believe him -- something feels

10:01AM  22  disturbingly wrong with the way this entire case has unfolded.

10:01AM  23     **THE COURT:**  May I suggest to you that you're not

10:01AM  24  doing him any good at all.

10:01AM  25     **MS. CHAMBERLAIN:**  Okay.  That's just my opinion.

10:01AM 1    **THE COURT:** I understand.  I'm just telling you

10:01AM 2  you're not doing him any good by criticizing the jury or

10:01AM 3  criticizing how the case -- you believe the case should have

10:01AM 4  unfolded or that sort of thing.  You know, it would do good if

10:01AM 5  you could tell me why it is that you think that he deserves a

10:01AM 6  lesser sentence, that kind of thing.

10:01AM 7    **MS. CHAMBERLAIN:**  Okay.  Which is coming as well.

10:01AM 8    I think we're a very divided people today,

10:01AM 9  evidenced by Jeremy's run for a Florida house seat in 2022 from

10:02AM 10  jail, where 42 percent of Hillsborough County residents voted

10:02AM 11  for him; not despite his incarceration, but because of it.  And

10:02AM 12  I think your leniency in this case could go a long way in

10:02AM 13  restoring faith in our criminal justice system.

10:02AM 14    Having never committed one act of violence, to

10:02AM 15  my knowledge, against his countrymen or the lawmen who arrested

10:02AM 16  him, Jeremy is hardly the threat he's been made out to be.  And

10:02AM 17  from what I understand, he has been a model prisoner during his

10:02AM 18  time behind bars, helping many of his fellow inmates.  That's

10:02AM 19  the real Jeremy Brown that I have learned to know.

10:02AM 20    So I respectfully ask for you to consider

10:02AM 21  Mr. Brown's distinguished military service, the 17 months he's

10:02AM 22  already served, and the omission of facts when sentencing him

10:03AM 23  today.  I hope you'll also consider his five young daughters

10:03AM 24  who would be denied their health insurance along with other

10:03AM 25  military dependent support and irreplaceable time with their

1    father.

2              For the sake of fairness, erring on the side of

3    caution --

4              THE COURT:  You realize, of course, that according to

5    Mr. Brown, he's estranged from his daughters?

6              MS. CHAMBERLAIN:  Yes, and this is partly --

7              THE COURT:  Okay.

8              MS. CHAMBERLAIN:  -- a part of that as well, and I

9    was estranged from my father for a long time when I was

10   younger, and --

11             THE COURT:  Well, and I'm not -- and I understand.

12   I'm just saying, it doesn't make a lot of sense to say he has

13   this time to be with his daughters when he's estranged from

14   them, and he hasn't been with them, so --

15             MS. CHAMBERLAIN:  Yeah.  I'm hoping to see that

16   change in the future, and only if he is in a position will that

17   change.

18             At any rate, I believe time served for Master

19   Sergeant Jeremy Brown.  It's past time for this nonviolence war

20   hero to come home.

21             THE COURT:  Thank you.

22             MS. CHAMBERLAIN:  Thank you, Your Honor.

23             MR. FUTERMAN:  Your Honor, I think his mother would

24   like to address the Court also.

25             I also have not seen these notes.

THE COURT: What?

MR. FUTERMAN: I have not seen this -- these notes
that -- she has written them down.

THE COURT: And I'm going to swear you in as well.
So if you'll raise your right hand, the clerk up here -- over
here. Over here. She's going to swear you in.

(Witness sworn.)

COURTROOM DEPUTY: Please state your name for the
record and spell your name.

MS. BROWN: I'm Lisa Brown. I'm Jeremy's mama.

COURTROOM DEPUTY: Please spell your name. Please
spell your name.

MS. BROWN: L-i-s-a, B-r-o-w-n.

COURTROOM DEPUTY: Thank you.

THE COURT: Go ahead, Ms. Brown. You can tell me
whatever you want.

MS. BROWN: Well, I'm Jeremy's mama. He is my first
born of three children. He has a sister, and he had a younger
brother who committed suicide due to the fact of a woman.

Jeremy -- I know him better than anybody in
here, and this man right there is no criminal. He is a good
man. He's a good father, and the only reason that he is not
seeing his children is because of the woman that he was married
to that defamed him, told him -- told her high powered women
down here in Tampa to spread the word that he was stolen valor.

10:06AM 1      **THE COURT:** That he was what?

10:06AM 2      **THE MOTHER:** Stolen valor, where they pretend like

10:06AM 3 they're a military person, but they're not. So him not being

10:06AM 4 able to see his children is strictly on her because he loves

10:07AM 5 his children. I want y'all to know that, all of you.

10:07AM 6      This has been hell to me. I'm not in the best

10:07AM 7 health. I asked after I had my surgery if he could come up to

10:07AM 8 help me. I was denied that by you people. I almost died.

10:07AM 9 Tylene showed me a picture of my daughter up against my face,

10:07AM 10 and I was wondering why was she like that? She was telling me

10:07AM 11 goodbye because I almost didn't make it. I came this close to

10:07AM 12 dying, and my son was locked up under false pretenses.

10:08AM 13      I'm really -- I'm a mad mother right now because

10:08AM 14 I know my child. I know him. From the time he was two years

10:08AM 15 old up until he graduated from high school, it was military,

10:08AM 16 military, military. I had moved to Raleigh, North Carolina,

10:08AM 17 and he was up there, but the high school that he started in

10:08AM 18 didn't have a ROTC program, so he asked if he could go back and

10:08AM 19 stay with his grandfather so he could be in the ROTC program,

10:08AM 20 and I said yes.

10:08AM 21      So that's why he has so much love -- he has love

10:08AM 22 for this country. He wanted to be a warrior for this country,

10:08AM 23 and, of course, he graduated at the age of 17. They could not

10:09AM 24 take him until he was 18, and during that time he took the EMT.

10:09AM 25 He passed that, but they couldn't give him a certificate yet

because he wasn't old enough to get the certificate, but he did get it later on.  But he even volunteered fire department.

For them to call him a criminal is sickening. He's a good man.  He served this country.  He lost best friends.  He lost the man that was his best man at his wedding way back when to this other crazy woman, and when they -- he -- he's even been to his grave site.

He's helped another lady, Jody, that her son was killed over there, and he went up to go to the funeral, but none of the military had contacted her about the -- all the rights that they have from being -- having a funeral of a military person.  He -- he took over the funeral for her and made sure that everything was on board, that he got his flag draped and everything.

He came from a military family.  My grandfather was Navy.  My dad was Navy.  His uncle is a retired lieutenant colonel in the Army, so he always wanted to be a military man.

But he loves this country, and he loves his family.  And, you know, this -- always talking about him being estranged to his children is because his ex is a lunatic.  I'm sorry, but I'm telling the truth on that because she even told me -- I asked her, I said, "You're not planning on leaving Tampa?"  "No, no, I'll never do that because I know it will kill Jeremy if I took the kids away."  And she snuck the kids out of this country -- out of this state.

So -- but he loves his children, but she -- her mission was to tear him apart, ruin him with his children, and some of them won't even communicate with him, but it doesn't mean that he doesn't love his child.

And I -- Tylene has been a strength for him. She has been by him through thick and thin, through all this stuff. It has cost her money. And, you know, they were talking about this trust thing, which that goes over my head, but they don't have that kind of money.

In Afghanistan, they were stationed near an orphanage for the little kids that had lost their parents and everything. Well, he writes me going, "Mama, can you get, you know, any balls and candy or books or something and send over?" So I got with the newspaper, and they put an article in there, so they were getting boxes of candy and balls and toys, and some author must have sent a book -- I don't know what the book was, I can't remember -- sent a book over there for the kids. And so -- but he -- you know, he loved those children. Every time they went by, they tried to give them candy or balls, and they're so excited, and they're playing and, you know, taking their minds off they've lost their parents. They lost their family, and he wanted to help them.

And then another time he calls me, "Mama, can you get me some Hawaiian shirts?" And I'm going, "What do you want Hawaiian shirts for?" He wanted his team to stand out in

the softball, when they played softball, so his team was the
only one that had Hawaiian shirts.  I went to thrift stores and
wherever I could find to get Hawaiian shirts for him.

And then when my son took his life, it was
Jeremy and Tylene came down and helped me with that.  They
arranged -- help me arrange the funeral and everything.  My
youngest son was 40 years old, had three children, and, of
course, he ended up with a woman was not faithful, and he just
couldn't take any more, and he killed himself.

Jeremy came, and I was asked about donating in
the -- I never thought I would ever, ever have to even hear
those words about donating organs and everything.  I'm supposed
to die before my children.

**THE COURT:**  Now what are you talking about?

**THE MOTHER:**  My youngest son, when they finished with
his body, Jeremy went to the hospital and brought him to the
funeral home in honor of him.  Like a military guy would escort
a military soldier that died, he escorted his brother to the
funeral home.

So we've had tragedies, and what's going on
right now is a tragedy.

Your Honor, I don't have a whole lot of time
left.  I am going -- leaving Tuesday because I've got two heart
doctor's appointments on Wednesday.  They want to do two other
surgeries on me.

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 10:16AM | 1  | So I'm asking that you take it -- he's a good |
| 10:16AM | 2  | man, and I'm so sorry that people have told you that he's not |
| 10:17AM | 3  | because I know his heart. I've seen it. |
| 10:17AM | 4  | I think that's all I can actually say right now. |
| 10:17AM | 5  | THE COURT: Okay. Thank you. |
| 10:17AM | 6  | MR. FUTERMAN: I know lots of people want to speak, I |
| 10:17AM | 7  | think it's appropriate not to call any more witnesses at this |
| 10:17AM | 8  | point. You've read many letters, and I think it's -- what I'd |
| 10:17AM | 9  | like to do, Your Honor, is after the Government makes any |
| 10:17AM | 10 | rebuttal or any argument against a variance down -- I have |
| 10:17AM | 11 | asked for a variance down. I hadn't discussed that, but I -- |
| 10:17AM | 12 | THE COURT: I know they're going to make an argument |
| 10:17AM | 13 | against it because they're asking for a high end guideline |
| 10:17AM | 14 | sentence. |
| 10:17AM | 15 | MR. FUTERMAN: Right. After they make that argument, |
| 10:17AM | 16 | he would like to allocute, and I would like to make a few brief |
| 10:17AM | 17 | responses to their argument. |
| 10:17AM | 18 | THE COURT: Okay. Thank you. Okay. Mr. Goedman? |
| 10:17AM | 19 | I'm sorry, Mr. Marcet? Done that twice now. |
| 10:18AM | 20 | MR. MARCET: May I approach the lectern, Your Honor? |
| 10:18AM | 21 | THE COURT: And you look nothing alike. |
| 10:18AM | 22 | MR. MARCET: It's a compliment to me, so I won't |
| 10:18AM | 23 | complain. |
| 10:18AM | 24 | So, Your Honor, you're correct. We're asking |
| 10:18AM | 25 | for a sentence at the high end of the guidelines of 108 months. |

10:18AM 1          So I think first to talk about the crimes here,

10:18AM 2   these are serious crimes that the Defendant exploited his

10:18AM 3   position in the Special Forces to commit.  The Defendant was

10:18AM 4   trained and trusted to handle some of our nation's most

10:18AM 5   dangerous weapons; trained and trusted in handling explosives,

10:18AM 6   in handling the exact M67 fragmentation grenades that he

10:18AM 7   possessed in this case, and he violated that trust.  He

10:18AM 8   violated that special position that he held as a primary

10:18AM 9   weapons sergeant in choosing to take these highly dangerous

10:18AM 10  weapons.

10:18AM 11          And he talked -- or his counsel talked about

10:18AM 12  putting his own life on the line for this country, and he did

10:19AM 13  that, but by taking those grenades and putting them in a

10:19AM 14  residential neighborhood with children in a highly populated

10:19AM 15  civilian area with his girlfriend, Ms. Aldridge, with other

10:19AM 16  family members, and with the law enforcement officers who

10:19AM 17  ultimately had to seize those grenades, he placed a lot of

10:19AM 18  other people's lives at risk too.

10:19AM 19          As the expert witnesses in this case explained,

10:19AM 20  these grenades were designed to explode and cause the steel

10:19AM 21  body to fragment into hundreds of small metal pieces, which are

10:19AM 22  projected out at very high velocities in a 360-degree pattern

10:19AM 23  in order to kill or cause casualties.  The people who live near

10:19AM 24  Mr. Brown, Mr. Brown's girlfriend, did not ask to be put in

10:19AM 25  harm's way like that.  And yet he did that in spite of his

extensive training.

And I found it interesting, a lot of the letters that were sent to Your Honor, in fact, expressed horror at this conduct. You had one letter from a weeping mom who wrote quote, "A tenured honorable Special Forces veteran would be the first to acknowledge the inherent danger in keeping such an item at hand."

And Cam Norton, another author of a letter who actually himself had multiple combat tours, said quote, "As a weapons specialist who has been in combat multiple times, I find it unimaginable that he," the Defendant, "would be so careless as to leave two live hand grenades on the floor of his RV where his girlfriend or any guest could unknowingly pick up the vest and possibly detonate one or both hand grenades." That's exactly right, Your Honor. The Defendant placed people, real people in his life who he cared about, at risk of death by explosion.

We also talk about the stolen classified documents. The Defendant, again, throughout the course of his career, had great trust placed in him; as a member of the Special Forces was granted the highest clearance that can be granted, and he violated that trust. He violated the numerous nondisclosure agreements that he signed throughout his career, disclosure agreements that told him, "If this information is mishandled, you're placing this nation's security at risk."

Knowing all of that, he took one of the documents. He kept it in an unsecured RV, and according to his own testimony, he was trying to shop a story about the subject of that document to numerous journalists over the years. And when he was caught, when those journalists told investigators what he had done, he lied, and he lied, and he hid that document. Why? Because it was important to him to keep it, for whatever purpose, but he knew it was improper, and he knew it placed a human being, the confidential human source who was discussed in that document, a person who trusted the Defendant, who trusted our armed forces to keep him safe, put that person at risk of arrest, torture, and murder at the hands of the Taliban in Afghanistan.

We've also heard a lot about the Defendant being someone who's never violated the law. Judge, this is not an isolated misstep by the Defendant. This case shows a pattern of conduct going back over a decade. We know the classified information and the grenades were stolen at some point prior to 2012 when he left the military, so that's over a decade of criminal conduct in which the Defendant took steps to lie and hide and conceal that criminal conduct until ultimately by happenstance it was uncovered, in this case when the search warrant was executed.

We know that after stealing that story, the Defendant engaged in further criminal conduct trying to shop that story about the classified document to journalists.

| | |
|---|---|
| 10:22AM | 1 |

We know that in 2017, six years ago, he committed another federal crime. He lied to federal investigators in the scope of an investigation, trying to recover that classified information. He told them he knew the exact document they were talking about, and he didn't have it when he knew full well that he had the document and that it was classified.

We also know that at some point after that, he came into possession of these short barrel weapons. He knew they had to be registered, and he simply chose not to do that, again, constantly substituting his own judgment for the law, for Court orders, and for doing the right thing.

We know he then participated in the January 6th riots, and while he did not go into the Capitol, Your Honor saw the videos of what he did; repeatedly leaning against the Capitol police officers trying to clear the area, officers who the Defendant, as a 20-year Special Forces veteran, knew were in serious danger given what was going on around them and given how outnumbered they were. Instead of deescalating the situation and leaving, he taunted them, he jawed at them, and he ultimately recorded that interview saying, "Well, we were peaceful this time. Next time we won't be."

Then in this case, we've heard that he was a model prisoner. Judge, you know that's not the case. We've seen his repeated obstructive conduct since his arrest in this

case.  We've seen him refusing to comply with DNA warrants.
We've seen him refusing to comply with Court orders to deposit
funds that got to the point after a series of hearings that
Judge Flynn had to actually find him in contempt to get him to
comply.  Again, multiple continued inappropriate illegal
misconduct over a lengthy period of time.

And then finally at the trial in this case,
under oath, the Defendant looked the jury in the eye and lied
and lied and lied, all in an attempt, a further attempt to
evade responsibility for these crimes.

And finally, talking about the Defendant's
military career, he served this country for 20 years, Your
Honor.  But when you read those glowing remarks from his
supervisors, remember they didn't know -- they didn't know when
they wrote that he had maintained 100 percent ammunition
accountability that he had, in fact, taken two M67
fragmentation grenades and stored them in a civilian
neighborhood.  They didn't know when they commented on his
integrity that he had taken a classified document and that he
was planning to shop it to journalists and that he was planning
to lie about it to investigators to hide it.  They didn't know
those things, Your Honor.

And how do we know they wouldn't have written
those reviews if they had known he committed those serious
crimes?  Because we see what happens when he uploads files of

pornography to the server. As Your Honor pointed out, that was an extremely harsh sanction for that crime or for that action in violation of military policy. So had they know the truth about the Defendant, had they known that he had stolen those grenades, that he had stolen that classified information, those reviews would have been different.

And, Your Honor, for the Defendant to now come before you and seek to wrap himself in the flag of this country, to point to his service as a mitigating factor when that service is exactly what he exploited to commit these crimes is not only completely disingenuous, it's entirely illogical. He used that service as a sword to commit these crimes. He can't now use it as a shield to evade punishment.

So for all those reasons, Your Honor, given the severity of these crimes, given the lengthy course of conduct continuing throughout this case of obstruction of justice, the United States respectfully submits that a sentence at the high end of the guidelines is appropriate. Thank you.

THE COURT: Mr. Futerman, you wanted to respond?

MR. FUTERMAN: Yes, Your Honor. I think I'll have Mr. Brown allocute and then respond, if that's appropriate.

THE COURT: Okay. Either way you'd like to do it.

MR. FUTERMAN: Thank you.

THE COURT: Mr. Brown, you want to stand at the podium, or you can stand where you are, either one.

THE DEFENDANT:  I'll stand at the podium, Your Honor.

THE COURT:  All right.  You swore him previously.  Go ahead.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Brown.

THE DEFENDANT:  Before we start, I would like to thank all of the American citizens that have shown up to hear this proceeding and to show their support for me and my family.  I would also like to thank you for the opportunity to speak.

I directed Mr. Futerman not to review any of the statements because I do not believe in the manipulation or the directing of people's free speech.  I wanted them to speak freely about what they felt, what they believe, what they think of me, what they think of the Department of Justice and the FBI.

The greatest dangers to liberty lurk in insidious encroachments by men of zeal, well meaning, but without understanding.  Supreme Court Justice Louis Brandeis from the dissent in <u>Olmstead v. United States</u>, a Fourth Amendment case from 1928.  It was later corrected, a mere 39 years later.

As early as I can remember, I knew I was going to be a soldier.  It was never in doubt, and the only person ever to come close to changing my path, Tom Cruise as Maverick.  He almost tricked me into becoming a Naval aviator in the

eighth grade.  My girlfriend has dated both a Green Beret and a

Blue Angel, and I would hope her testimony would be that I won.

So I think I made the right choice.

At the age of 14, I moved away from my mother,

as she testified to, to live with my grandfather, a World

War II Navy veteran, because the high school in his town

offered Navy Junior ROTC.  In just three years, I achieved what

was designed to take four years.  I was promoted to Commander

of the entire program.

At age 17, with my mother's permission and

signature, I enlisted in the United States Army's delayed entry

program, and on October 27th, 1992, I left my small hometown of

less than 5,000 people and joined the United States Army and

never looked back.

I passed Infantry School, Airborne School, then

tried out for and was selected to First Ranger Battalion, 75th

Ranger Regimen, the Army's most elite infantry unit and part of

the special operations community.

In less than three years, I was promoted to the

noncommissioned officer corps as a sergeant and ranger rifle

team leader.  Less than a year later, I had attended Special

Forces assessment and selection and was selected as a Special

Forces weapons sergeant and had begun training to become one of

the worlds most legendary warriors, a Green Beret.

In July of 1997, at the age of 22, I was on my

first Special Forces Operational Detachment Alpha, SFOD A.  At
that time, I was the second youngest Green Beret in the entire
force.  My friend and Special Forces brother and Ranger
brother, Sergeant Major Retired Scott Olsen was the youngest.

By 1998, I was in my first classified war zone
in a country that doesn't even appear on my official military
record.

By May of 2007, I had progressed within Special
Forces from an E-5 sergeant to an E-8 master sergeant or team
sergeant.  On a 12-man Special Forces team, there is only one
master sergeant.

During my 20-year special operations career, I
spent a quarter of it at my highest rank, a rank less than 10
percent of all Green Berets ever achieve.

I took my life's mission and my sworn oath to
this nation extremely serious, and to this very day I still do.

In this trial, complete strangers that know
nothing about me or my service have attempted to tarnish that
service with mischaracterizations and flat-out lies, but my
service cannot be tarnished by lesser men.  The written records
of that service have been provided for you to examine.  20
years of quantifiable accomplishments on behalf of this nation
recorded in evaluation reports and combat award narratives
written by Rangers and Green Berets who led me, lived in
shitholes with me, fought, bled, and cried beside me, and

unfortunately sometimes mourned our fallen with me.

These are the men that 16 out of 17 times sign their names to evaluations that identified my service as among the best in an elite force that makes up less than 1 percent of the United States military.

But my leaders aren't the only ones with those observations. One of my soldiers became an investigative journalist and New York Times best selling author. Jack Murphy in his memoir *Murphy's Law*, published in 2019 after I had spoken to him about exposing the Obama administration's treason, wrote this on page 259.

"Something else I've grown to appreciate over the years is the leadership that I worked under in Ranger Battalion and in Special Forces. In my work as a journalist, I've uncovered the dark side of the military enough times to become cynical. I have fallen from the special faith that exists between a soldier and his army. I no longer believe. However, when I look back at squad leader Ken, platoon sergeant Van Nuys, ODA team leader Marcus, and team sergeant Jeremy, I realize how incredible -- how incredibly fortunate I was to have ethical leaders. At the time, they may have come across as strong or even harsh, but they were fair and made sure I stayed on the right path. Now that I've seen what looks like -- now that I've seen what it looks like when soldiers are left unsupervised and unaccountable, I appreciate these men

10:34AM  1    even more."

10:34AM  2                This is what the men I've served with know about

10:34AM  3    me.  These prosecutors have made false claims to this Court and

10:35AM  4    are -- that are easily proven false.  They have repeated

10:35AM  5    several times that I was barred from reenlistment.  Yet this

10:35AM  6    can be proven wrong simply by looking at the official record of

10:35AM  7    my separation, my DD214.  In block 18, it clearly states,

10:35AM  8    "Subject to active duty recall by the secretary of the Army."

10:35AM  9    In blocks 23 through 28, it cites army regulation 635-200

10:35AM  10   Chapter 12 and shows I honorably retired with the separation

10:35AM  11   code of Romeo Bravo Delta and a reentry code of 4 Romeo.  These

10:35AM  12   are the same codes on Sergeant Major Retired Olsen's and

10:35AM  13   Lieutenant Colonel Retired Pecky's (phonetic) DD214, which

10:36AM  14   means sufficient service for retirement and that I cannot

10:36AM  15   reenter because I've retired.

10:36AM  16               There are numerous codes that can be found in

10:36AM  17   AR 635-200 that details many reasons for separation and barring

10:36AM  18   reentry.  I have none of these codes.  I am honorably retired.

10:36AM  19   There is nothing honorable with the DOJ's fraud on this Court

10:36AM  20   and the American people.

10:36AM  21        THE COURT:  Mr. Brown, are you saying that you could

10:36AM  22   have rejoined after serving your 20 years if you had wanted to?

10:36AM  23        THE DEFENDANT:  No, Your Honor, because I retired.

10:36AM  24   That's --

10:36AM  25        THE COURT:  That's not my question.  My question is

10:36AM 1 could you have rejoined and not retired?

10:36AM 2    **THE DEFENDANT:** That was never an option for me, so I

10:36AM 3 never explored it, Your Honor. I came to Tampa --

10:36AM 4    **THE COURT:** You're not answering my question. You

10:37AM 5 just read a bunch of codes. Isn't the truth that you could not

10:37AM 6 rejoin?

10:37AM 7    **THE DEFENDANT:** No, Your Honor, or else it would be

10:37AM 8 annotated in the reentry code.

10:37AM 9    **THE COURT:** Oh, so you are saying you could have

10:37AM 10 rejoined the Army and chosen not to retire?

10:37AM 11    **THE DEFENDANT:** I'm stating Army regulation --

10:37AM 12    **THE COURT:** All right. You're not answering my

10:37AM 13 question. Go ahead.

10:37AM 14    **THE DEFENDANT:** Your Honor, this is not the only

10:37AM 15 fraud they have committed on your court. They intentionally

10:37AM 16 played a partial phone call that was cut off two minutes into

10:37AM 17 my girlfriend's weary description of the prior day's events.

10:37AM 18 With this incomplete conversation, they told the jury my

10:37AM 19 silence was an admission of my guilt. This was a malicious

10:37AM 20 trick because they knew after many attempts I found a good

10:37AM 21 phone and completed a full 25-minute call that this DOJ kept

10:37AM 22 from the jury. In that call, you will hear me calm because the

10:38AM 23 love of my life was exhausted and afraid. You hear me clearly

10:38AM 24 respond once she finished her full description that their story

10:38AM 25 was quote "bullshit."

One more tiny detail. I own numerous legally purchased smoke and airsoft grenades. So the term "grenade" used by the girlfriend of a retired Green Beret did not phase me or cause a reaction. The information in the full call that there were live M67 frag grenades that needed to be detonated received my appropriate response, quote, "That's bullshit." Unimaginable is 100% correct. Only the DOJ and FBI would try to sell such a tale.

Lastly, is the pretrial efforts to distance this case from any testimony about January 6th and the illegal recruitment of me prior to January 6th and at best the FBI's prior knowledge of the events of January 6th and at worst their direct involvement in commanding control of these events. Yet now when there are no rules of evidence or chance to cross-examine their claims, they proclaimed it was always about January 6th.

THE COURT: It was you all that didn't want to go into January 6th. It was the defense.

THE DEFENDANT: There was only one person in this courtroom that wanted me to go into January 6th, and that was me.

THE COURT: Well, for whatever reason, you chose not to do it. But go ahead.

THE DEFENDANT: I understand exactly what happened, Your Honor. This is nothing more than legal system bait and

switch.

Judge Bucklew, you and I have taken the same oath, to support and defend the same Constitution and the same rights and liberties it protects, and we've taken this oath for very likely the same reasons:  To secure the blessings of liberty for ourselves and our children.

You and I both have children we love that have chosen lifestyles that some people and some laws have not agreed with.  You took a stand against a state law because you believed it violated your child's liberty, and now that law is no more.  I applaud your stand for liberty.

I am making that same stand right now against the FBI's violation of everyone's liberty in hopes of stopping these insidious encroachments upon mine and my children's rights, and they have targeted me, arrested me, and are seeking to destroy me.

The truth will come out, and it's coming out more and more each day.  When it does, the questions will be who knew, and when did they know?

Judge Bucklew, these prosecutors have attempted to deceive you and the jury with enough success to receive and secure a flawed conviction.  Now, they are hoping you don't understand what this trial is a part of or the true reason for this malicious persecution.  But if you give me a chance by giving me a sentence of time served, I will not rest until the

10:42AM 1    truth is fully exposed.

10:42AM 2                Today is my 555th day in jail, 482 of which I

10:42AM 3    was held in maximum security.  But with a sentence of time

10:42AM 4    served, you will free me to continue to expose the truth, to

10:42AM 5    correct this false conviction through the appellate process,

10:42AM 6    and to uphold our oath to support and defend the Constitution

10:42AM 7    of this great nation.

10:42AM 8                I pledge to you my life, my fortune, and my

10:42AM 9    sacred honor that when the final story of this chapter in our

10:42AM 10   nation's history is written, you will be proud that your

10:43AM 11   judgment today will have been the tipping point towards

10:43AM 12   justice.

10:43AM 13               Your Honor, I thank you for this opportunity to

10:43AM 14   speak on the record and to be heard by the American people.  It

10:43AM 15   has actually been a pleasure and an honor to work with you in

10:43AM 16   this case.

10:43AM 17               De oppresso liber, and may God bless and restore

10:43AM 18   the United States of America.  Thank you, Your Honor.

10:43AM 19         **THE COURT:**  Thank you, Mr. Brown.

10:43AM 20               Mr. Futerman, you wanted to make some follow-up

10:43AM 21   remarks?

10:43AM 22         **MR. FUTERMAN:**  Just briefly.  Just a couple of

10:43AM 23   follow-up comments to the Government's position of why they

10:43AM 24   think the high end of the guidelines is appropriate and why I

10:43AM 25   really disagree with them and ask the Court to vary down from

10:44AM 1    the bottom of the guidelines.

10:44AM 2          They brought up Mr. Brown's Special Forces as a

10:44AM 3    characteristic for asking for the high end, but, of course, as

10:44AM 4    the Court is aware, there's a two-level enhancement for abuse

10:44AM 5    of trust that got him to 87 months. That's almost a cumulative

10:44AM 6    argument.

10:44AM 7          We talked about the cases. I think we can all

10:44AM 8    agree, Count 1 and Count 2 were stipulated to by the defense at

10:44AM 9    trial. These were guns that he owned, one from his dead

10:44AM 10    brother and another one. They weren't sinister in nature.

10:44AM 11    They were just marginally owned.

10:44AM 12          Count 3 and Count 1 -- Count 1, Count 2, Count 3

10:44AM 13    and 4 would all have been legal if he would have paid a $200

10:44AM 14    fee and register. So the irony about the emotional statements

10:44AM 15    about that, these would all have been legal counts -- 1, 2, 3,

10:44AM 16    4 -- if he had paid a fee and registered them.

10:44AM 17       **THE COURT:** Well, you're minimizing something,

10:44AM 18    Mr. Futerman. It's more than that. You know, they have to be

10:44AM 19    registered because of the type of firearms that they are. You

10:45AM 20    know, they're inherently dangerous. A short barreled shotgun

10:45AM 21    and a short barreled rifle make them easier to conceal. That's

10:45AM 22    the whole purpose of requiring registration.

10:45AM 23          People can't just have grenades sitting around

10:45AM 24    in an RV out in the middle of a residential area, and yes, I'm

10:45AM 25    not -- I'm not sure what's required in registering a grenade.

In fact, it was shocking to me you could have grenades, even if registered, but the point is that it's -- you know, it's not fair to just minimize this and say, "Well, if you'd just have paid the fee, everything would have been fine."

MR. FUTERMAN: I agree with the Court 100%. I just wanted to put it in the context, and maybe that is a minimization that is too far on one scale, but I did want to put it in the context.

Count 5, of course, was a misdemeanor in terms of its potential storage, and I think there is some at least acknowledgment when we talk about the storage, that it was a misdemeanor.

The Government testified documents. He was acquitted by 6, 7 -- excuse me, 6, 7, 8. So we're talking about a document, and I think there is a distinction because it's something he authored, and also the Government talked about the information. That was something he authored. He was passionate about that soldier that he was involved in. It was 2011. The information was stale. I think the court will -- I hope the Court will agree that the Government's characterization that he was trying to use this information in 2017 either to sell it or to get sort of fame was not the case. This was something he felt principled about, right or wrong, passionate about, right or wrong, something he was involved in, and he wanted to speak out about it, but he certainly didn't

10:46AM 1 try to get any money out of this in 2017. He had it since

10:46AM 2 2011, and there was -- I think that's a distinction of terms of

10:46AM 3 their characterization of that particular authored document.

10:47AM 4       THE COURT: Well, you know, with respect to that

10:47AM 5 count, we probably wouldn't even be here if when the

10:47AM 6 investigator went out and asked him about the document, he had

10:47AM 7 just turned over --

10:47AM 8       MR. FUTERMAN: I agree 100%.

10:47AM 9       THE COURT: -- instead of lying. I mean, you know,

10:47AM 10 we wouldn't be here on that in all probability.

10:47AM 11       MR. FUTERMAN: I agree. You're right. And that

10:47AM 12 boosted his guidelines significantly --

10:47AM 13       THE COURT: It did.

10:47AM 14       MR. FUTERMAN: -- because of that one authored

10:47AM 15 document. If they had found him not guilty of that authored

10:47AM 16 document, he would have essentially been very close in the

10:47AM 17 guidelines to what he has served. And so the significance of

10:47AM 18 that finding was significantly impacted in the guidelines,

10:47AM 19 which is something for the Court. And there's a lot of

10:47AM 20 emotions, there's a lot of views in this case, but I know the

10:47AM 21 Court will look at the 3553 factors and recognize that one

10:47AM 22 authored document boosts him significantly from about 24 months

10:47AM 23 to the 87 months.

10:47AM 24       So I am asking the Court to consider under the

10:47AM 25 3553 factors what this Court has also recognized the

extraordinary and aberrational service of this man and the comments by both United States Congressman and Congresswoman and State Representative in the support of the variance, and I'm asking the Court to consider that.

We can't just -- I know you won't -- brush under the rug this extraordinary brave career of 20 years. Although there's a punishment component based on the jury's finding, the Government's request for the high end of the guidelines is not appropriate given what you know about his characteristics and the support he's received and the reasons for the support he's received.

I am asking Court to vary down from the 87 months to an appropriate sentence which will also include some of the discussions that you talked in supervised release with some of the counseling and various other things at the back end to that sentence, Your Honor.

THE COURT: Thank you.

MR. FUTERMAN: Thank you.

THE COURT: Mr. Marcet, anything else on behalf of the United States before I impose sentence?

MR. MARCET: Your Honor, just about the question you raised about registering the grenades. A, these grenades were stolen from the U.S. Army, so there would have been no way to register them. B, he would have needed to build an entire bunker to safely house them, as the ATF agent testified to, and

so it's kind of -- it's not merely a failure to register.  It's

the taking of these dangerous weapons and the storing of them

in a completely unsafe manner.

        **THE COURT:**  All right.  Anything else from anyone

before I proceed with sentencing?

        **MR. FUTERMAN:**  No, Your Honor.

        **THE COURT:**  Okay.  Mr. Marcet, any reason I shouldn't

proceed with sentencing?

        **MR. MARCET:**  No, Your Honor.  Just to clarify though,

the paragraphs 82, 83, and 84 of the PSI, you'll take care of

that later?

        **THE COURT:**  Yes.  And that's a good place to start.

I'm going to instruct the probation officer to strike the

footnote in the presentence investigation report.  Hold on and

I'll go to the page.  It's on page 13, but the rest of

paragraph 75 stays in.

        **THE PROBATION OFFICER:**  Yes, Your Honor.

        **THE COURT:**  I'm also going to -- hold on here, find

the correct paragraph.  I'm going to ask the probation officer

to delete from an asset the asset online fundraising GiveSendGo

in the amount of $169,925.

        **THE PROBATION OFFICER:**  Yes, Your Honor.

        **THE COURT:**  And as far as the Baker Act

information -- and I'm referring I believe on page 14 to

paragraph 82 and 83 -- I need to look at that.

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 10:51AM  | 1  | **THE PROBATION OFFICER:** Yes, Your Honor.                          |
| 10:51AM  | 2  | **THE COURT:** Okay. One question I did have for you,                |
| 10:51AM  | 3  | Mr. Futerman, and perhaps the -- you know without having asked,      |
| 10:51AM  | 4  | the presentence report says the Defendant communicated that the     |
| 10:51AM  | 5  | Vet -- Office of Veterans' Affairs declared him 30 percent           |
| 10:51AM  | 6  | disabled due to combat injuries. What is that based on?             |
| 10:51AM  | 7  | **MR. FUTERMAN:** Do you mean in terms of what specific             |
| 10:51AM  | 8  | injuries, or do you mean --                                          |
| 10:51AM  | 9  | **THE COURT:** Yeah. Well, he gets a 30 percent                     |
| 10:51AM  | 10 | disablement apparently. He's considered 30 percent disabled by      |
| 10:51AM  | 11 | the Veterans' Affairs. I'm looking at him. I don't see him          |
| 10:52AM  | 12 | physically. Is that a mental or a physical?                         |
| 10:52AM  | 13 | **MR. FUTERMAN:** My understanding -- and I haven't                 |
| 10:52AM  | 14 | verified this, but my understanding is there was a VA ruling        |
| 10:52AM  | 15 | specifically on the issue, and it was based on physical combat      |
| 10:52AM  | 16 | issues.                                                              |
| 10:52AM  | 17 | **THE COURT:** Okay. Thank you. All right. Mr. Brown,               |
| 10:52AM  | 18 | if you will stand, please, I'm going to impose sentence at this     |
| 10:52AM  | 19 | time.                                                                |
| 10:52AM  | 20 | A lot of what I'm going to say I've already                         |
| 10:52AM  | 21 | said, but there's a sentencing statement that I normally go         |
| 10:52AM  | 22 | through, and so I'm just going to follow the sentencing             |
| 10:52AM  | 23 | statement.                                                           |
| 10:52AM  | 24 | Mr. Brown, on December the 12th, 2022, a jury                       |
| 10:52AM  | 25 | found you guilty of Count 1 of the Second Superseding              |

Indictment charging you with possession of an unregistered shotgun having a barrel less than 18 inches.

Count 2, they found you guilty of Count 2 charging you with possession of an unregistered rifle having a barrel less than 16 inches.

They found you guilty of Counts 3 and 4, possession of unregistered explosive grenades.

They found you guilty of Count 5, and this is the misdemeanor we were talking about, improper storage of explosive material.

And they also found you guilty of Count 10, willful retention of a national defense document.

And we've now reached the stage of the proceedings where it's my duty and my job to impose sentence. You've told me you've been over the presentence report with Mr. Futerman, and I too have read the presentence report. There was an objection to the obstruction of justice enhancement, which I have overruled. There was also an objection regarding paragraph 75 and the footnote on that page, and I have ruled on that as well.

There were several oral objections which we have gone through, none of which had any -- anything to do or made any -- would make any difference in the sentence that I'm going to impose.

The only objection that really had an effect on

the sentence was the obstruction of justice objection.

So I'm going to adopt the facts with the changes that I've made and the guideline calculations that are in the presentence investigation report.  So I'm going to determine that the advisory guidelines, the total offense level is a 29. The criminal history category is I.  That means you have absolutely no criminal history.  The range of imprisonment is 87 to 108 months.  1 to 3 years is the supervised release range as to Counts 1 through 4 and 10, and there's a one-year term of supervised release as to Count 5.

There is a fine range, $30,000 to $250,000.  I am not going to impose a fine.  The Government has said they're not going to ask for a fine, so I'm not imposing a fine in this case.  So the issue of whether or not you have access to the GoFundMe or the similar titled account is really not an issue.

There is a $525 special assessment, and that's based on the number of counts that you were convicted of.  I cannot waive that.  It is due and payable immediately.

I've been -- I asked both your counsel and I asked the Government counsel if there's any reason why I should not impose sentence at this time, and I was told by both parties there is no reason.

Mr. Brown, I listened to everything that was said this morning, and obviously I presided over the trial, so I heard the testimony at the trial, and obviously I'm

considering the jury's verdict in this case of guilty on the counts that I've already outlined.

You know, your attorney has asked that I vary downward, and he's stated a number of reasons. You're a 20-year veteran of the Army. You served in Special Forces. You had the rank of master sergeant. Up until the end, all of your evaluations were excellent. You got two bronze stars among other -- among other awards. So certainly -- certainly I can credit your service to the country for 20 years.

You have no criminal record, and that's very unusual for defendants that are in front of me, but there are also some cons. You've absolutely accepted no responsibility to what's -- you've done in this case, and you are defiant to the end. And you admitted to the sawed-off shotgun, the possession of the sawed-off shotgun and the sawed-off rifle and apparently knew that they were illegal without a permit but -- or a license, and you just didn't pay the registration. But, you know, I think it's diminishing the importance of the crime by just saying, "Well, I just didn't pay the registration or the license fee."

You've taken no responsibility for the grenades whatsoever. In fact, you have said they were not your grenades, and you suggested, in so many words, that they have been planted by either the FBI or some of the other people that were searching your residence, which is ridiculous.

|     |     |
| --- | --- |
| 10:58AM | 1 |

          There -- you -- the history in front of the
Court -- not this Court, I agree.  You were a perfect gentleman
at the trial, and you've acted appropriately here today, and
you certainly acted appropriately in the trial, but Judge Flynn
had to hold you in contempt of Court to get you to pay the
money that you owed.  You should have paid for the attorney
that represented you in the beginning.  You know, you've
essentially in many ways held yourself above the law, that
whatever you know and whatever you think is what is the right
thing, regardless of what may be the law.

          You know, military career, there's no doubt your
military career was tarnished by what happened at the end, that
you uploaded the videos and photos, some of which was
pornography.  You were seen as what they called or you called a
gomer, which was very harshly worded and, you know, said you
were a discredit to -- to the noncommissioned officers and to
the U.S. Army.

          You know, many of the letters that I got talked
about the fact you're a strong family man, which is really not
the case; maybe with your girlfriend, but certainly not as they
have written in the letters with your children.

          So there's pros and cons on both sides as far as
what sentence that I should impose in this case, but I don't
think there's a reason to vary downward, and I'm not going to
vary downward.

10:59 AM 1          You know, I recognize that -- that your service

11:00 AM 2     to the country up until perhaps the end was extraordinary, and

11:00 AM 3     you won two bronze stars, among other things, and you got great

11:00 AM 4     evaluations, but then you tarnished it to a good deal at the

11:00 AM 5     end as well.

11:00 AM 6          I'm not going to vary downwards, but I am going

11:00 AM 7     to impose a sentence at the low end of the advisory guidelines.

11:00 AM 8     I'm not going to impose a sentence at the high end of the

11:00 AM 9     advisory guidelines.  And normally when a defendant goes to

11:00 AM 10    trial, what happens is that they end up getting a sentence at

11:00 AM 11    the high end of the guidelines because things come out during

11:00 AM 12    trial that makes -- makes it more egregious.  So -- and it

11:00 AM 13    didn't help your case that you got up and lied when you

11:00 AM 14    testified, but the sentence that I am going to impose -- which

11:00 AM 15    I think is a sentence that's sufficient but not greater than

11:00 AM 16    necessary, recognizing your service to your country, but also

11:01 AM 17    recognizing the egregiousness of the crimes that were committed

11:01 AM 18    as well as your lying on the stand.  The sentence that I am

11:01 AM 19    going to impose is 87 months in the Bureau of Prisons, which is

11:01 AM 20    the low end of the advisory guidelines.  The 87 months will run

11:01 AM 21    concurrent as to Counts 1 through 4 and Count 10.

11:01 AM 22          As far as the sentence on Count 5, which is the

11:01 AM 23    misdemeanor offense, I'm going to sentence you to time served

11:01 AM 24    on that offense.

11:01 AM 25          Upon release from imprisonment, I'll place you

11:01AM 1  on a term of three years of supervised release, and it will run

11:01AM 2  concurrent as to Counts 1 through 4 and Count 10.  You'll have

11:01AM 3  to comply with the standard conditions adopted by the Middle

11:01AM 4  District of Florida for supervised release.

11:01AM 5         I am going to order mental health counseling

11:02AM 6  because as far as I know, you were Baker Acted twice.  So I

11:02AM 7  will need to go in and research that, but if they examine you

11:02AM 8  and determine you do not need mental health counseling, then it

11:02AM 9  won't be a part of your supervised release, but I am going to

11:02AM 10  order that you be examined by a doctor to determine whether you

11:02AM 11  need mental health counseling.

11:02AM 12         Because of the convictions, you'll also have to

11:02AM 13  submit to a search of your person, residence, and place of

11:02AM 14  business, any storage units under your control, computer or

11:02AM 15  vehicle, anything under your control conducted by the United

11:02AM 16  States Probation Office during your probationary or supervised

11:02AM 17  release period, if they do it at a reasonable time in a

11:02AM 18  reasonable manner and they have a reasonable suspicion there's

11:02AM 19  contraband there or evidence of a violation of supervised

11:02AM 20  release, and if you fail to do that, it could be a violation of

11:02AM 21  supervised release.

11:03AM 22         You'll have to cooperate in the collection of

11:03AM 23  DNA by the probation office.  The mandatory drug testing

11:03AM 24  requirements are suspended.  You have no drug problem, so there

11:03AM 25  will be no mandatory drug testing requirements and no drug

| | |
|---|---|
| 11:03 AM | 1 |
| 11:03 AM | 2 |
| 11:03 AM | 3 |
| 11:03 AM | 4 |
| 11:03 AM | 5 |
| 11:03 AM | 6 |
| 11:03 AM | 7 |
| 11:03 AM | 8 |
| 11:03 AM | 9 |
| 11:03 AM | 10 |
| 11:03 AM | 11 |
| 11:03 AM | 12 |
| 11:03 AM | 13 |
| 11:04 AM | 14 |
| 11:04 AM | 15 |
| 11:04 AM | 16 |
| 11:04 AM | 17 |
| 11:04 AM | 18 |
| 11:04 AM | 19 |
| 11:04 AM | 20 |
| 11:04 AM | 21 |
| 11:04 AM | 22 |
| 11:04 AM | 23 |
| 11:04 AM | 24 |
| 11:04 AM | 25 |

counseling.  However, you still are required to submit to random drug testing while on supervised release should the probation officer request it.

There is a forfeiture in this case, and the forfeiture has to do with the shotgun, the rifle, and the grenades, all of which were illegal, and I entered a preliminary order.  It will become final with this sentencing.

Is there any objections to that, Mr. Futerman?

MR. FUTERMAN:  No, Your Honor.

THE COURT:  All right.  Then it will become final with the sentencing here today.

As I've said earlier, you'll have to pay the special assessment of the $525 which is due and payable immediately.  In addition, I will waive the fine.  In this case, the Government has stated they are not seeking a fine.

I've considered the 3553 factors in imposing this sentence and have determined that this is a sentence that's sufficient, but not greater than necessary.

Mr. Marcet, there's a -- at least one underlying Indictment.  Do you move to dismiss it at this time?

MR. MARCET:  I haven't done that before, but, yes, we'll move to dismiss the original Indictment and the Superseding Indictment.

THE COURT:  Okay.  I will dismiss any underlying indictments.

11:04AM 1        Mr. Futerman, this Court having pronounced

11:04AM 2  sentence, do you have any objections to the sentence or the

11:04AM 3  manner in which it was imposed, other than those that you've

11:04AM 4  raised?

11:04AM 5        MR. FUTERMAN:  No, Your Honor.

11:04AM 6        THE COURT:  Okay.  Do you have any recommendations?

11:04AM 7        MR. FUTERMAN:  Judge, we would ask one, Pensacola, if

11:05AM 8  possible; and two, Coleman.

11:05AM 9        THE COURT:  Okay.  Mr. Marcet, do you have any

11:05AM 10 objections to the sentence or the manner in which it was

11:05AM 11 imposed, other than those you've raised?

11:05AM 12        MR. MARCET:  No, Your Honor.  I may have missed it.

11:05AM 13 We had said earlier that everyone agreed there would be a

11:05AM 14 condition of supervision that he pay any outstanding child

11:05AM 15 support obligations.

11:05AM 16        THE COURT:  And I forgot to include that.  He has

11:05AM 17 agreed, and there is a -- there is an outstanding child support

11:05AM 18 owed, and let me go to the exact amount.  The probation officer

11:05AM 19 has stated in the presentence investigation report on page 18

11:05AM 20 that he owes $21,817 in back child support.  So I'm going to

11:05AM 21 make that a condition of the supervised release, that you pay

11:05AM 22 the arrearage, child support arrearage.

11:06AM 23        You have the right to appeal the sentence that

11:06AM 24 I've imposed.  Any notice of appeal must be filed within 14

11:06AM 25 days, or it's waived.  You had Court-appointed counsel in the

11:06AM  1   beginning, but then you've also had retained counsel, so I'm

11:06AM  2   assuming you can afford counsel to represent you in appeal.  If

11:06AM  3   that's different, then Mr. Futerman will need to file

11:06AM  4   something, but 14 days is the time frame in which you've got to

11:06AM  5   file a notice of appeal.

11:06AM  6           I will recommend Pensacola, number 1, and I'll

11:06AM  7   recommend Coleman, number 2, as a -- as a facility.

11:06AM  8           Anything else?

11:06AM  9       MR. FUTERMAN:  No, Your Honor.  Thank you.

11:06AM  10       THE COURT:  Anything else to come before the Court

11:06AM  11   period?

11:06AM  12       MR. FUTERMAN:  No, Your Honor.

11:06AM  13       THE COURT:  Mr. Marcet?

11:06AM  14       MR. MARCET:  No, Your Honor.  Thank you.

11:06AM  15       THE COURT:  All right.  Then this Court is adjourned.

11:06AM  16   Thank you.

11:06AM  17           (End of proceedings.)

18

19

20

21

22

23

24

25

* * * * * * * * * * * * * * * * * * * * *

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA


REPORTER TRANSCRIPT CERTIFICATE

I, Tana J. Hess, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 83 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.

_____

Tana J. Hess, CRR, RMR, FCRR
Official Court Reporter
United States District Court
Middle District of Florida
Tampa Division
Date:  May 25, 2023